[Sac. No. 3375. In Bank.—April 23, 1923.]

## L. E. WOODSEND, Respondent, v. A. G. CHATOM et al., Appellants.

[1] LANDLORD AND TENANT — CONSTRUCTION OF INSTRUMENT—TENANCY IN COMMON IN CROPS.—Where an owner of land and another entered into a writing, whereby the former, in substance, agreed to lease said land to the other for a specified term with a renewal privilege, to furnish and buy various articles of personal property, including livestock, to pay one-half of the cost necessary to maintain pumps for irrigating purposes, to furnish and develop an amount of water as should be mutually agreed upon, and to build a house, and the other party agreed to supply all labor necessary to work the land and make repairs, to provide feed for horses, to keep certain personal property in good repair, to pay one-half the water rent and to plant such crops as would prove most profitable and to be mutually agreed upon, and to buy a half interest in certain livestock, it being further agreed between the parties that the "ranch shall be run on 50 per cent basis to each party," that the owner reserved the right to sell said property provided the equity of the other was properly protected, that the latter was to take possession not later than a certain time and was to forfeit all his rights in case of his failure to comply with the agreement, if within his power to do so, the relation of landlord and tenant as defined in *Harrelson* v. *Miller & Lux*, 182 Cal. 408, existed, and by the instrument it was intended to create the relation of tenancy in common in the crop to be raised.

[2] ID.—SALE OF CROP BY TENANT — AUTHORITY.—Under such an agreement, the tenant had no authority to sell the whole of the crop grown on the land, the disposition that the owner should

---

1. When cropping agreement creates tenancy in common, note, 37 Am. Rep. 609.

make of his share of the crop being a matter for his determination alone.

[3] Id.—Sale to Third Parties—Conversion—Estoppel—Evidence. The owner is not estopped from claiming in an action for conversion his share of the crop grown under such an agreement after a sale of the same by the tenant to third parties, where the crop was sold about a year after the lease in question was executed, the lease had been of record for a period of five months before said sale, and had said third parties examined the records they would have at least been put on inquiry as to the ownership of the products of the premises owned by plaintiff, there being no showing that the tenant had ever before the transaction in question made any sales of crops for plaintiff or was ever held out by him as being clothed with any such authority.

[4] Sales—Title of Purchaser—Nature of.—As a general rule, a purchaser of personal property acquires only the title or estate of his vendor.

APPEAL from a judgment of the Superior Court of Tulare County. W. B. Wallace, Judge. Affirmed.

The facts are stated in the opinion of the court.

Power & McFadzean and W. W. Middlecoff for Appellants.

Farnsworth, McClure & Burke and Dickson F. Maddox for Respondent.

SEAWELL, J.—This is an action in conversion. Judgment went for plaintiff and defendants have appealed.

Respondent, as party of the first part, and H. B. Wyllie, as party of the second part, entered into a contract, agreement, or lease, the nature of which is a matter of dispute, whereby the party of the first part agreed to lease to the party of the second part 240 acres of land owned by the former and situate in Tulare County. The instrument provided for a term of three years with a renewal privilege of two years. By said instrument the party of the first part agreed to furnish certain seed for the first year's tenancy. Thereafter seed was to be furnished from the premises or, if not so furnished, the expense of supplying the same was to be borne equally by the parties to the contract. It was the obligation of the party of the first part to furnish horses, plows, tools, and other equipment, in good and reasonable

condition. A long list of personal property to be furnished by the said party of the first part is enumerated. The party of the first part agreed to pay one-half of the cost necessary to maintain pumps for irrigating purposes and also agreed to furnish material for fencing as it should become necessary; also to furnish and develop a reasonable amount of water necessary for conducting the enterprise as occasion should demand and as should be mutually agreed upon between the parties; to build within one year after the execution of the lease a five or six room house for the use of the party of the second part. He agreed further to buy a one-half interest in pigs and to purchase an undivided half interest in a certain number of calves. The party of the second part agreed to supply all labor necessary to work the land under the lease and to plant all land that could be reasonably planted during his first year's tenancy and thereafter to fertilize the soil as provided by the agreement, and to do everything necessary to the soil to successfully produce crops. Said party agreed to furnish labor for fencing and to repair such small buildings as might be required from time to time; to provide feed for the horses, labor for planting the first year's crops, and to keep all tools, harness, wagons, and all implements in good repair, and in every way promote the best interest of the parties concerned; to pay one-half the water rent and to plant such crops as would prove most profitable and to be mutually agreed upon; to furnish one-half of the purchase price of hogs or other stock to be fed from crops produced on the premises; to buy an undivided half interest in thirty yearling calves on the premises at a price of $35 each, payment to be evidenced by note and mortgage at five per cent interest. Both parties to the contract were equally interested in the chickens, turkeys, and such fowls that should be raised. It was agreed between the parties that the "ranch shall be run on 50 per cent basis to each party." The party of the first part reserved the right to sell the said property provided the equity of the second party was properly protected. It was "agreed that lessee is to take possession not later than Dec. 10, 1918." The following forfeiture clause was inserted: "Party of the second part agrees to forfeit all rights and titles to any interest he may have, covered by this lease, if he fails to comply with this agreement, if within his power to do so."

Under the foregoing lease a crop of red milo maize of the value of $1,822.34 was raised and sold by Wyllie to the defendants, who were warehousemen and grain buyers at Corcoran, Kings County. It appears without dispute that respondent let H. B. Wyllie into possession of said 240 acres of land and that during his occupancy said maize was sown, cultivated, reaped, and sold to appellants, who had no actual notice that the land upon which it was raised was owned by respondent or that Wyllie was not fully authorized to sell the same. The lease or contract was of record.

The proposition to which counsel have devoted much attention is whether the instrument in question is in legal effect a lease of lands or a cropping lease or copartnership agreement, or established a relation of tenants in common. It is labeled "lease." The first expression found with reference to the relations of the parties is that "the party of the first part agrees to lease," etc. It provides for a definite period of three years' tenancy with a privilege of two additional years. In its recitals the term "lessee" appears once. It contains a forfeiture clause, and provides that "the ranch shall be run on a 50 per cent basis to each party." In the production of crops all labor is to be furnished by said Wyllie. It contains a number of covenants to be performed by both parties.

It is the claim of respondent that the instrument in question is a cropping agreement and does not create the relation of landlord and tenant, but conceding it to be a lease, nevertheless, the parties thereunder were tenants in common as to the particular crop raised and sold by said Wyllie, one-half of which is claimed to be the property of respondent.

Appellants' claim is that the instrument meets all the requirements of an ordinary lease, the rent payable in the products of the soil rather than in money, and that the relation of landlord and tenant existed between the parties. Further, that if said writing was not a lease it constituted as between the parties a copartnership agreement, and that Wyllie had a right as a partner to make a valid sale of crops to appellants.

Phrases common to articles of copartnership are intermingled with those essential to constitute a lease. Wyllie was let into possession, but he was not given absolute control as to the kind of crops to be raised. The instrument

provides that such crops were to be planted as "will prove most profitable and be *mutually agreed upon.*" (Italics ours.) Impliedly plaintiff would be required to enter the premises to comply with his covenants, and perhaps he would have the right of entry for the purpose of inspection and to enable him to advise as to the kind of crops to be planted, the acreage and locality, and the method of cultivation to be adopted. The instrument is somewhat unusual in some of its provisions. As an illustration, it provides that each party shall hold an "undivided half interest in calves." It bears also some of the features of a cropping contract.

[1] We are of the opinion, however, upon an examination of its terms, that the relation of landlord and tenant as defined in *Harrelson* v. *Miller & Lux,* 182 Cal. 408 [188 Pac. 800], existed, and that by the instrument it was intended to create the relation of tenancy in common in the crop to be raised. One of the strong elements noted in that case, to wit, delivery to plaintiff of his share of the crops to be made off the premises, is lacking here. This, however, does not in the least weaken the contention that the parties to the agreement were to become owners of the crops as tenants in common in equal shares. This question did not enter into the consideration of *Harrelson* v. *Miller & Lux, supra.*

The rule announced in *Clark et al.* v. *Cobb,* 121 Cal. 595 [54 Pac. 74], is not disturbed by the conclusion we have arrived at in the instant case. It was expressly held in that case that the conventional relation of landlord and tenant existed between the parties and that the grains and fruits to be delivered to the landlord when gathered and harvested was but the payment of rent. It is clearly pointed out in that case that the single difference differentiating the contracts there considered from ordinary leases was that the rent was to be paid in the products of the soil rather than in money. The Clark case recognizes, however, that there is authority in this state holding that under certain conditions, even though a landlord and tenant be not cotenants in the land, they may, nevertheless, be cotenants in the crops raised on the land, citing cases already referred to. See, also, *Adams* v. *Thornton,* 7 Cal. Unrep. 219 [82 Pac. 215]. The landlord here, as in the case last cited, was to do more than merely receive a stipulated part of the crop as rent. The facts which sustain the conclusion in *Clark* v. *Cobb, supra,*

are different in material respects from the covenants which exist in the contract of the parties to the present action.

The greater weight of authority and the better reasoning is to the effect that whether the relationship existing between Wyllie and respondent be that of landlord and tenant or a cropping relation, a tenancy in common in the crops was created by the terms of the contract. This principle was well recognized by this court in *Bernal* v. *Hoveous,* 17 Cal. 541 [79 Am. Dec. 147]; *Henderson* v. *Allen,* 23 Cal. 519; *Walls* v. *Preston,* 25 Cal. 60; *Baughman* v. *Reed,* 75 Cal. 319 [7 Am. St. Rep. 170, 17 Pac. 222]; *Jones* v. *Durrer,* 96 Cal. 93 [30 Pac. 1027].

*Baughman* v. *Reed, supra,* strongly supports the claim of cotenancy, which is the pivotal point in this case. Freeman on Cotenancy and Partition, second edition, section 100, states the reason of the rule thus: ''Every form of agreement by which land is let to one who is to cultivate the same and give the owner as compensation therefor a share of the produce, creates a tenancy in common in the crops. An arrangement to cultivate land on the shares is not a lease. Landlords, therefore, favor this mode of letting their lands, because they thereby acquire an interest in the produce of the land, whereas if such an agreement constituted a complete lease, the title to the crop produced would vest in the occupier, and the landlord would have no claim upon it until a division was made, and then his share would come to him as rent. 'Where the reservation is of an undivided share the property of that share is always in the lessor by virtue of his reservation, while the property of the residue is always in the tenant by the implied grant of profits, and they are therefore tenants in common of the crop until division.' 'The true test seems to lie in the question, whether there be any provision, in whatever form, for dividing the specific products of the premises. If there be, a tenancy in common arises, at least in such products as are to be divided.' ''

In discussing the same question here presented, the court in *Fuhrman* v. *Interior Warehouse Co.,* 64 Wash. 159 [37 L. R. A. (N. S.) 89, 116 Pac. 666], said: ''The weight of authority is that every contract, whereby use of land is given to a party to cultivate and return to the owner a specified portion of the crop produced, creates a tenancy in common

in the crop, and that this is true whether the agreement between the parties is a lease or a mere cropping contract. The tendency of the courts is to hold that, whenever there is a provision in any form of contract for a specific division of crops produced, a tenancy in common arises therein. Freeman on Cotenancy and Partition, 2d ed., sec. 100; *Foote* v. *Colvin,* 3 Johns. (N. Y.) 216 [3 Am. Dec. 478]; *Putnam* v. *Wise,* 1 Hill (N. Y.), 234 [37 Am. Dec. 309]; *Aiken* v. *Smith,* 21 Vt. 172; *Smyth* v. *Tankersley,* 20 Ala. 212 [56 Am. Dec. 193]; *Dinehart* v. *Wilson,* 15 Barb. (N. Y.) 595; *Abernethy* v. *Uhlman,* 52 Or. 359 [93 Pac. 936, 97 Pac. 540]. In *Smyth* v. *Tankersley, supra,* the court said: 'In the case of *Thompson* v. *Mawhinney* (17 Ala. 362 [52 Am. Dec. 176]), *supra,* it was decided by this court that a contract made with the owner of land, which the other party agreed to cultivate and to divide the products equally with him, was not technically speaking a lease, but that a tenancy in common was created in the products. In the contract under consideration, the mode of compensation adopted repels the conclusion that it could have been the intention of the parties that the land should not be cultivated, and thus assimilates its terms more closely to the contract in the case last cited. It is true the phraseology adopted is that which is usual in leases, but the substance of the agreement is to be regarded, rather than the words, *Putnam* v. *Wise, supra,* and in contracts of this description the true test seems to be that, wherever provision is made for dividing the specific products of the land, a tenancy in common results. *Putnam* v. *Wise, supra,* and authorities there cited.' "

The rule that where a landlord leases land and receives a part of the crop as rent the tenant cannot sell or dispose of the part so reserved and the landlord and tenant are cotenants in relation to such crop is so highly favored as to have become the settled law in at least some of the states. (*Cooper* v. *McGrew,* 8 Or. 327, and cases cited; *Abernethy* v. *Uhlman,* 52 Or. 359, 93 Pac. 936, 97 Pac. 540].)

Our conclusion is that the instrument before us possesses the indicia of a lease and by its terms the parties thereto were made tenants in common in the crops to be raised.

The claim that the parties to the writing were copartners is disposed of by the cases already cited, to which may be

added the case of *Smith* v. *Schultz,* 89 Cal. 526 [26 Pac. 1087].

No mention is made in the instrument as to marketing or disposing of the crop after harvest and no authority was directly or impliedly given to Wyllie to act for respondent. [2] In selling the whole of said crop the former acted without authority. As to what disposition respondent should make of his share of the crops was a matter for his determination alone. If he concluded it would be to his interest to dispose of them jointly with Wyllie he might have done so, otherwise he had a right to insist on a partition or division.

[3] Under the present settled state of the law governing sales of personal property the principle of estoppel could not be applied to the facts of this case. The lease was executed December 14, 1918, and the crop in litigation was sold on December 23, 1919. Respondent was the owner of the land, and we are not advised that Wyllie owned said premises at any time or ever occupied them prior to December, 1918. His occupancy was brief. The lease had been of record for a period of five months before said sale. There is nothing before us to justify the conclusion that Wyllie had ever before the transaction in question made any sales of corn or other produce for respondent or was ever held out by him as being clothed with any such authority. Had appellants examined the records they would have at least been put on inquiry as to the ownership of the products of the premises owned by respondent.

[4] We find nothing to justify us in changing the general rule that a purchaser of personal property acquires only the title or estate of his vendor. (*California Cured Fruit Assn.* v. *Stelling,* 141 Cal. 713 [75 Pac. 320]; *Pacific States Corp.* v. *Gill,* 57 Cal. App. 90 [206 Pac. 489].)

The judgment is affirmed.

Kerrigan, J., Lennon, J., Lawlor, J., Wilbur, C. J., Waste, J., and Myers, J., concurred.