[Crim. No. 2473. In Bank.—June 28, 1923.]

In the Matter of K. OKAHARA on Habeas Corpus.

[1] ALIEN LAND LAW—EXECUTION OF CONTRACT WITH JAPANESE ALIEN —NATURE OF CONTRACT—NONVIOLATION OF LAW.—The alien land law (Stats. 1921, p. lxxxiii), which provides that all aliens, other than those eligible to citizenship, "may acquire, possess, enjoy and transfer real property, or any interest therein, in this state, in the manner, and to the extent, and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise," and that "if two or more persons

---

1. Power of state under fourteenth amendment to the United States constitution to deny to aliens the right to engage in a lawful occupation, note, 11 L. R. A. (N. S.) 799.

conspire to effect a transfer of real property, or of an interest therein, in violation of the provisions hereof," they are subject to punishment, is not violated by the execution of a contract between a tenant of real property and a Japanese alien ineligible to citizenship, to or on whom the right of acquisition or ownership of agricultural lands or an interest therein is not guaranteed or conferred by any treaty relations existing between the Empire of Japan and this country, where such contract, if it cannot be said to be an agreement of employment pure and simple, cannot be held to be more than a cropping contract.

[2] LANDLORD AND TENANT—CROPS—TENANCY IN COMMON.—A tenancy in common may exist in crops and none whatever exist in the land.

PROCEEDING on Habeas Corpus to secure release of Japanese alien from custody for alleged violation of alien land law. Petitioner discharged.

The facts are stated in the opinion of the court.

Thomas & Sullivan and Raglan Tuttle for Petitioner.

U. S. Webb, Attorney-General, Frank English, Deputy Attorney-General, and C. C. Coolidge, District Attorney, for Respondent.

SEAWELL, J.—Petitioner, K. Okahara, a person of the Japanese race and a native-born subject of the Empire of Japan, and being ineligible to citizenship in this country, is restrained of his liberty by the sheriff of Placer County, this state, upon a warrant issued on a complaint charging him with conspiring with one Tom Vicencio to unlawfully and feloniously effect a transfer of an interest in real property in violation of section 10 of the alien land law, approved November 2, 1920, by the people of this state as an initiative measure (Stats. 1921, p. lxxxiii). By this proceeding he asks to be released from custody upon the theory that he has committed no public offense.

The gravamen of the offense charged is that on March 20, 1922, petitioner, in furtherance of an unlawful conspiracy, executed an agreement and contract with said Vicencio, whereby said Vicencio transferred to petitioner for a term of five years *an interest* in a certain parcel of agricultural land containing twenty acres, situate in the county of Placer. The portions of the act which bear

directly on the case are sections 2 and 10, which provide as follows:

"Section 2. All aliens other than those mentioned in section 1 of this act (aliens eligible to citizenship) may acquire, possess, enjoy and transfer real property, or any interest therein, in this state, in the manner, and to the extent, and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise."

"Section 10. If two or more persons conspire to effect a transfer of real property, of or an interest therein, in violation of the provisions hereof, they are punishable by imprisonment in the county jail or state penitentiary, not exceeding two years, or by a fine not exceeding $5,000, or both."

The acquisition or ownership of agricultural lands or an interest therein is not one of the rights guaranteed to or conferred on alien Japanese by any treaty relations existing between the Empire of Japan and this country.

The facts relied upon to sustain the charge of conspiracy are those which constitute the substance of the covenants of the parties to the contract and therefore appear upon the face of the instrument, the material portions of which follow:

Vicencio, the party of the first part, who is himself but a tenant of the real property in controversy, is called by the instrument the employer, and Okahara, the party of the second part, is called the contractor. Said contractor agrees to clear all of said twenty acres of land and make it ready for plowing and planting within a period of two years from the date of the execution of said agreement, one-half of said land to be cleared during the first year of the agreement and the remaining half during the second year at the price of fifty dollars an acre. The contractor is to plant the whole of said property to orchard within two years from the date of said agreement, all trees to be furnished by the employer. The contractor agrees to plant between the rows of fruit trees five acres of the land to raspberries, five acres to blackberries, five acres to straw-berries, and five acres to tomatoes, cantaloupes, and other garden truck. The agreement provides that the party of

the second part is an independent contractor and he is required to adopt the most approved customs of the neighborhood in the care, raising, and cultivation of fruit trees, vines, and such vegetables as shall be grown on said property. He also agrees to gather, pick, and pack all merchantable fruits, berries, and vegetables at seasonable times and make delivery thereof at any fruit house designated by the employer. The contractor further agrees to furnish all and every kind of labor and all and every kind of machinery, tools, and equipment necessary for the performance of the terms of said agreement. Such tools and implements as are on said premises may be used by the contractor in the performance of the contract and are to be returned at the expiration thereof in as good condition as when received, wear and tear excepted. The products from the soil are to be sold by the employer on such terms and conditions as he may deem best and the contractor is to receive as his compensation (in addition to the allowance hereinbefore mentioned of fifty dollars per acre for clearing said land) fifty per cent of the net proceeds derived from the sale of said products. The contractor's share of the net proceeds shall be paid to him in cash by the employer within thirty days after receipt thereof. Certain deductions are to be made from the net proceeds and allowed the employer, such as for shook, hay, straw, or other materials furnished by him to the contractor, and all costs, charges, commissions, and expenses paid or incurred by said employer on account of the products or the marketing thereof, including all costs, charges, expenses paid or incurred by the employer in the cultivation of said land and orchard other than work done by the contractor, as well as all sums of money advanced by the employer to the contractor, and all indebtedness due or payable to the employer by the contractor.

Paragraphs 6 and 7 of said agreement contain the terms and covenants by which the legal status of the agreement must be fixed and followed in the language of the contract;

"6. It is understood and agreed that the contractor shall have access to the land hereinbefore described at all convenient times for the purpose of doing the work aforesaid. All crops of every nature and character to be grown on said land shall belong to and be the property of the em-

ployer and the contractor shall have no interest, right or claim in or to any part of the said crops but his sole right shall be to the compensation paid by the employer as herein provided and the said compensation shall be in full payment for all services of said contractor for outlays and expenses paid or incurred by the contractor in or about said work.

"7. The employer shall have no control over the said contractor and his employees and equipment, but the contractor agrees that he and all persons employed by him shall be *sufficient* and diligent in the prosecution of said work, all of which shall be done in good and workmanlike manner and according to the best husbandry and methods of doing said work. It is further understood and agreed that if at any time the employer is dissatisfied with the work done by the contractor or with the progress of such work he may immediately terminate this contract on paying to the contractor compensation up to the time of such termination, as follows: Upon ten days' written notice given by employer to contractor, said compensation to be the usual wages paid for similar work in the same neighborhood.

"Neither this agreement nor any interest therein shall be assignable or transferable by the contractor either voluntarily or involuntarily, without the consent of the employer, in writing first had and obtained."

The validity of section 10 of the alien land law is not open to question as this court recently, in a proceeding in which its validity was assailed, pronounced it valid. (*In re Akado*, 188 Cal. 739 [207 Pac. 245].) It is there said: "It is well settled that, in the absence of a treaty to the contrary, a state may forbid the taking or holding of property within its limits by aliens. (*Blythe* v. *Hinckley*, 127 Cal. 436 [59 Pac. 787].) Our constitution leaves to the legislature this power with regard to all aliens ineligible to citizenship. (Art. I, sec. 17.) The provisions of the act in terms allow such aliens to take and hold agricultural lands to the extent that such taking or holding is prescribed by any treaty with the country of which such alien is a subject. The treaty with Japan does not prescribe or secure to its citizens the right to take or hold agricultural land situated in this state. Hence the act does not violate the

treaty in that respect.'' (See, also, cases cited in *Blythe* v. *Hinckley,* 127 Cal. 436 [59 Pac. 787]; *O'Brien* v. *Webb,* 279 Fed. 117; *Porterfield* v. *Webb,* 279 Fed. 114; *Terrace* v. *Thompson,* 274 Fed. 841.) The only question before us, therefore, is whether the acts, purposes, and objects as shown upon the face of the instrument are, in fact, such acts, agreements, purposes, and objects as are forbidden by subdivision 10 of the alien land law. If by a reasonable construction of the agreement the case is fairly brought within the inhibition of the law the petitioner should be remanded, otherwise he must be discharged.

It is the law of this and most of the states of our Union that contracts of the character of the one before us do not transfer or convey any interest in real property. Neither do they constitute agreements to do so. At a very early period in our judicial history and at a time before the ownership of lands by aliens not eligible to citizenship had excited public interest, this court in *Bernal* v. *Hovious,* 17 Cal. 542 [79 Am. Dec. 147] (decided in 1861), Field, C. J., writing the opinion, held that an agreement in relation to the use and cultivation of land between the parties whereby the owner was to furnish the seed, teams, and sacks and the other party was to do the work and give the owner for the use of the land one-third of the grain raised, although designated by the parties a lease, was not one, but a contract for the working of a farm upon shares. (*Bernal* v. *Hovious, supra.*) That case, a leading one, is based on the rule declared in *Caswell* v. *Districh,* 15 Wend. (N. Y.) 379 and *Putman* v. *Wise,* 1 Hill (N. Y.), 235, and runs through the decisions of this state.

Unquestionably, much care was taken in the selection of the words and phrases by the parties to the agreement with a view to avoid a violation of the law under which the charge is laid. But few of the formal words and phrases ordinarily found in freehold or leasehold instruments appear in the agreement. It is true as suggested by counsel for the state that the character of an instrument depends upon the intention of the parties as disclosed by the language used to express the intention of the parties and not by any particular name given it by them. But it is also true that we are not permitted to make the instrument before us the basis for a criminal action, even though we may be

able to concur in the suggestion that it was artfully and
adroitly drawn for the purpose of avoiding a conflict with
a penal statute of the state. The question is: Does it show
upon its face a violation of the law as written? In form
and in substance this contract follows closely a contract
considered and upheld by the United States district court,
northern district of California, in the case of *O'Brien* v.
*Webb, supra,* and we entertain no doubt but that it was
patterned after that contract and its drafters were aided
by the discussion of the question therein made.

By the application of the rule above invoked the instru-
ment before us cannot be characterized as a lease or trans-
fer of any interest in real property because it lacks many
of the essential elements of a lease, while, on the other hand,
it bears all the characteristics of an agreement of hiring.
[1] But if it cannot be said to be an agreement of employ-
ment pure and simple it cannot under any rule of construc-
tion be held to be more than a cropping contract. The
right of entry or access is not, as it is contended, equivalent
to possession as that word is used in a prohibitive sense.
Access to the place upon which labor is to be performed
is necessary for the execution of any conceivable contract
of employment. Petitioner here is merely given access to
the premises at all convenient times for the purpose of per-
forming service. The situation in this respect is precisely
as it would be if he were paid a daily or monthly wage.
Under such employment no one would question his right to
physically go upon and remain upon the premises. Every
agreement or contract to perform farm labor must of neces-
sity give the physical right to go upon the premises upon
which the labor is to be done. In the contract under con-
sideration nothing is said about leasing or letting the prem-
ises but, on the contrary, it is expressly provided that "all
crops of every nature and character to be grown on said
land shall belong to and be the property of the employer,
and the contractor shall have no interest, right or claim
in or to any part of said crops, but his *sole right* shall be
to the compensation paid by the employer" as provided by
said agreement. (Italics ours.)

The fact that the crops are to be converted into money
by the employer and divided on a net basis with the con-
tractor could not work a transfer of any interest in the

soil to the latter any more than the payment of wages made with moneys derived from the sale of the products of the soil under the most informal contract of employment would convey an interest in the soil to an employee who assisted in the labor of production.

The clause of the contract most criticised is the one which provides that "the employer shall have no control over the contractor and his employees." This clause amounts to no more than a statement of an implied privilege or right granted to every contractor, unless expressly limited, and has no special significance in determining the character of the agreement one way or the other. The above-quoted clause is immediately followed by the provision that the employer, "if dissatisfied with the work done, or the progress of such work," may upon giving the contractor ten days' notice terminate the contract. If the employer elects to terminate the contract the contractor is to receive for his compensation the wages usually paid for the performance of similar work in the neighborhood. The contractor is not given a free hand to plant as he wills, but is specifically held to the planting of certain named varieties of berries of limited acreage, garden truck, and an orchard of twenty acres. All crops of every kind and character grown on the land shall belong to and be the property of the employer and the contractor shall have *no interest, right, or claim to any part of said crops.* By the abundance of the crops produced and the market price, less the cost of production, his compensation is fixed for the services performed.

[2] The authorities are quite general to the effect that a tenancy in common may exist in crops and none whatever exist in the land. This principle of law is recognized in *Woodsend* v. *Chalom, ante,* p. 72 [214 Pac. 965]; *Clarke* v. *Cobb,* 121 Cal. 595 [54 Pac. 74]; *Bernal* v. *Hovious,* 17 Cal. 542 [79 Am. Dec. 147]; *Henderson* v. *Allen,* 23 Cal. 519; *Walls* v. *Preston,* 25 Cal. 60; *Baughman* v. *Reed,* 75 Cal. 319 [7 Am. St. Rep. 170, 17 Pac. 222]; *Jones* v. *Durrer,* 96 Cal. 95 [30 Pac. 1027]; *O'Brien* v. *Webb, supra; Smyth* v. *Tenkersley,* 20 Ala. 212 [56 Am. Dec. 193].

In *Henderson* v. *Allen, supra,* it is said: "It has been repeatedly held that even the letting of land to a person to cultivate—the crops to be divided between the owner

and the cropper, in certain proportions—did not amount to a lease, or create the relation of landlord and tenant between them. In such case, the owner is held to be in possession of the land, and the parties are joint tenants in the crop. (Citing authorities.) In such case, it is an agreement to work on shares, and not a lease to render rent, for which an action will lie against defendant.''

Warvelle on Ejectment, section 26, states the situation as follows: ''It is common for parties to enter into agreements for the cultivation of land 'on shares,' that is, one person contributing the use of land while another plants and cultivates the crop, which, when harvested, is divided between them. It is well settled that such an agreement does not create a tenancy of any kind on the part of the cultivator. At best, he is only a tenant in common of the crop, which is generally regarded as personalty, and the legal possession of the land is in the owner.'' (See, also, *Fuhrman* v. *Interior Warehouse Co.*, 64 Wash. 159 [37 L. R. A. (N. S.) 89, 116 Pac. 666]; 1 Taylor on Landlord and Tenant, sec. 24a; *State* v. *Jewell,* 34 N. J. L. 259.)

In *Taylor* v. *Donahoe,* 125 Wis. 513 [103 N. W. 1099], the distinction between a tenant and a cropper is clearly stated by the author of the opinion. It is there said: ''The distinction between a tenant and a cropper is that a tenant has an estate in the land for a given time, and a right of property in the crops, and hence makes the division thereof between himself and the landlord in case of an agreement upon shares, while a cropper has no estate in the land, nor ownership of the crops, but is merely a servant, and receives his share of the crops from the landlord, in whom the title is. It is always a question of construction of the agreement under which the parties are acting. The agreement in question here seems to us to be very clear and definite upon the subject. It nowhere refers to Finnegan as a tenant, but specifically refers to his work as 'service,' and expressly provides that Donahoe shall pay him for his service by certain shares of the crops, and that the possession of the land and ownership of the crops are to remain in Donahoe, and that Finnegan is merely to be an employee in the tilling of the land and caring for the stock. Language could hardly be plainer or more appropriate for the purpose of creating a cropper arrangement.''

It will be noted that the phraseology in many of the instruments under consideration is that which is usually found in leases but the substance of the agreements being regarded the instruments were held to create the relationship of a tenancy in common. In some cases they purported on their faces to be leases. It is true that there may be created by the use of appropriate language, in a single instrument, the relationship of landlord and tenant and also the relationship of a tenancy in common in crops. But the intention of the parties and the nature of the covenants to be performed must be of such character as to sustain such a construction. Nothing in the language of the instrument before us would permit of such a construction.

The words "acquire, possess, enjoy and transfer" used in an inhibitory sense are well understood legal terms. "Acquire" as used in the law of contracts and descents means to become the owner of property; to make one's own. (1 Words & Phrases, 113.) "Possess" used in reference to land titles and estates means to own; have as a belonging; property. (Cent. Dict.) "In popular usage the word 'possess' includes real and personal property to which one has title as his landed possessions." (Webster's Dict.; 6 Words & Phrases, 54, 63, and cases cited.) The word "enjoy" is one frequently found in instruments of transfer and means to make such use of the thing transferred as is consistent with the tenure by which it is held. "Transfer" is a word commonly used to denote a passing of title in property (usually realty) or an interest therein from one to another. The entire class, if considered with reference to its context, leaves no room for doubt as to what is meant thereby. The purpose of the alien land law, as is well said in *O'Brien* v. *Webb, supra,* "was apparently to prevent ownership and legal interest in farming lands from passing to aliens who never could become citizens; and there is nothing from which it can be legitimately inferred that the design of the law is to prevent an alien from entering into a cropping agreement whereby he gives his labor for a share in the crops to be raised." It must be presumed that the act was adopted by the people with the full understanding on their part of the law of estates, tenures, and

transfers as created by constitutional and legislative authority and as expounded by the courts of the land. It must further be presumed that the law was passed with full understanding on the part of the people of the state of existing laws governing or affecting cognate subjects. The argument that the law forbids the making of a contract of employment or agreement to till the soil on shares can only be sustained by adopting the theory that the particular agreement under consideration transfers an interest in land. To accept this theory it would become necessary to give a new and unwarranted interpretation to words and terms of ancient and established usage the meaning of which has long been settled by judicial pronouncements and legislative sanction.

The extreme care exhibited by the selection of terms to avoid a transfer of an interest in real property seems to have strengthened the conviction in the minds of counsel for the state that the entire transaction is a cunningly devised plan calculated to circumvent the law and defeat the object intended thereby to be accomplished. No undisclosed or secret designs on the part of either of the parties to the agreement, if any such really exist, have been revealed in this proceeding and we cannot from the face of the instrument alone presume that any exist. If the agreement be but a subterfuge, as argued, by which illegal and forbidden purposes may be consummated, the state is not shorn of its power by anything here decided to show by legal evidence the true relationship existing between the parties by such conduct, facts, and circumstances as may tend to establish a relationship different from the one claimed to exist as in other cases charging conspiracy.

Courts are not clothed with legislative power. And it is not within the province of the judicial tribunals to suggest what the state's policy should or should not be in respect to questions purely legislative in character. We can only say that we have examined the questions presented with care and feel convinced that we are not authorized by the language of the act under which the charge is laid to hold that the facts as presented are sufficient to justify us in holding that petitioner has committed a public offense. We are not at liberty to extend the application of the law to subjects not

included within it either by express language or by fair implication.

The petitioner must therefore be discharged.

Wilbur, C. J., Waste, J., Kerrigan, J., Myers, J., and Lennon, J., concurred.