[L. A. No. 8214. In Bank.—December 9, 1924.]

W. L. PORTERFIELD et al., Appellants, v. U. S. WEBB, as Attorney-General of the State of California, et al., Respondents.

[1] ALIEN LAND LAW—PROSECUTION UNDER—INJUNCTION TO PREVENT —RIGHT TO MAINTAIN ACTION.—An owner of agricultural land who is a citizen of the state and another who is a subject of Japan may maintain an action for an injunction against the attorney-general and the district attorney, who threaten them with prosecutions under the escheat and forfeiture sections of the Alien Land Law (Stats. 1921, p. lxxxiii) and amendments of 1923 (c. 444, p. 1020), if they shall enter into a certain cropping agreement affecting the land, which action has for its purpose the testing of the validity of said act, and it being contended that plaintiffs have been unlawfully coerced by said threats of prose-

1. Injunction against criminal prosecution, note, 35 Am. St. Rep. 670.

Injunction against prosecution under invalid ordinance, note, 118 Am. St. Rep. 372; 6 Ann. Cas. 1013; 10 Ann. Cas. 760. See, also, 14 R. C. L. 434, 435; 14 Cal. Jur. 213.

cution from entering into said agreement and are thereby deprived
of their property without due process of law and are denied the
equal protection of the law in contravention to the fourteenth
amendment to the constitution, and it being also contended that
said law denies to an ineligible alien the right to labor or to.
engage in the common and ordinary employments of the country.

[2] ID.—CROPPING CONTRACT—WHEN VOID.—A contract between a
citizen owner of agricultural land and a foreigner ineligible for
citizenship, which provides, in substance, that the latter shall
plant, cultivate, and harvest certain designated garden-truck and
vegetables and such other crops as the owner may thereafter
designate, in a good and farmerlike manner, and shall furnish all
necessary tools, farming implements, and all labor necessary to
carry out the terms of the contract, and, among other things, har-
vest, pack, and haul the same to the market, for which the owner
is to give the alien a certain percentage of the crops grown as
compensation for his services, and also granting to him the right
to a division of the crops after the same are harvested and before
the removal thereof from the land, but the contract providing
that it is not intended to create a lease nor give to the cropper any
interest whatever in, or possession of, any of the land except the
right of ingress and egress necessary for the purposes of carrying
out the terms of the contract, is in violation of the Alien Land
Law of this state.

[3] ID.—CONSTITUTIONALITY OF ACT.—The provisions of the Alien
Land Law of this state prohibiting an alien who is ineligible to
citizenship from acquiring, possessing, enjoying, or transferring
real property, or any interest therein, in this state, except as in
said act provided, and providing for escheat of property and
punishment for violation of said act, do not offend any clause
or provision of the state or federal constitution, or violate any
treaty obligations or right existing between this country and the
Empire of Japan.

[4] ID.—DENIAL OF RIGHT TO CONTRACT—RIGHT TO EARN LIVING.—
The denial of an alien ineligible to citizenship of the right to
make such cropper's contract does not deny to him the ordinary
means of making a livelihood.

---

2.  See Cal. Jur. Supp. 43, 44.

3.  Power of alien to hold land, note, 14 **Am. Dec.** 97. See, also,
1 **Cal. Jur.** 915; **Cal. Jur. Supp.** 42–44; 1 **R. C. L.** 806.

4. Power of state under fourteenth amendment to federal consti-
tution to deny alien right to engage in lawful occupation, notes,
11 **L. R. A.** (N. S.) 799; 40 **L. R. A.** (N. S.) 281. See, also, 1 **Cal.
Jur.** 916 (and supplement to **Cal. Jur.**).

Prohibiting or restricting employment of aliens, notes, **Ann. Cas.**
1917B, 287; **L. R. A.** 1916D, 569. See, also, 1 **R. C. L.** 800.

[5] ID.— RACIAL DISTINCTIONS — CLASSIFICATIONS.—Racial distinctions may furnish legitimate grounds for classifications under some conditions of social or governmental necessities.

[6] ID.—INELIGIBLE ALIENAGE—CONSTITUTIONAL AND TREATY RIGHTS— AGRICULTURAL LANDS.—Ineligible alienage is not deprived of any constitutional or treaty rights by reserving the agricultural lands of the nation for the use, occupancy, benefit, and enjoyment of its citizens or those eligible to become citizens, nor denied the right to engage in the ordinary employments or means of earning a livelihood.

---

(1) 32 C. J., p. 248, sec. 389.   (2) 2 C. J., p. 1050, sec. 11.   (3) 2 C. J., p. 1050, sec. 11.   (4) 12 C. J., p. 1200, sec. 965.   (5) 12 C. J., p. 1133, sec. 857.   (6) 12 C. J., p. 1200, sec. 966; 38 Cyc., p. 970.

APPEAL from a judgment of the Superior Court of Los Angeles County. Ralph H. Clock, Judge. Affirmed.

The facts are stated in the opinion of the court.

Edward W. Tuttle and Charles W. Fourl for Appellants.

U. S. Webb, Attorney-General, Frank English, Deputy Attorney-General, Asa Keyes, District Attorney, and Tracy Chatfield Becker, Deputy District Attorney, for Respondents.

Albert H. Elliott, *Amicus Curiae.*

SEAWELL, J.—Appeal from a judgment of dismissal after a general demurrer sustained to the complaint without leave to amend.

Plaintiff Porterfield, a citizen and resident of the county of Los Angeles, this state, and an owner of agricultural land situate in said county of Los Angeles, and his coplaintiff Mizuno, a resident of this state, but born of Japanese parents in Japan and a subject of the emperor of that country, being mutually desirous of entering into a cropping contract for the planting, cultivating, and harvesting of garden produce for the market and the growing of such other crops as the owner of the lands might designate, prepared an agreement acceptable to both, and claim the right to execute the same, whereby Mizuno proposes to undertake, *inter alia,* the plant-

---

5. See 6 R. C. L. 380; 5 Cal. Jur. 843.

ing, cultivating, and farming of said agricultural lands, situ-·
ate in said county of Los Angeles and belonging to Porter-
field, for which farm service he is to receive a percentage of
all the crops (in kind) raised or grown upon said farm lands.
Upon being threatened by the attorney-general of the state
and the district attorney of Los Angeles County with prose-
cutions under the escheat and forfeiture sections of the Alien
Land Law (Stats. 1921, p. lxxxiii), an initiative measure, and
the amendments thereto adopted at the session of the legis-
lature of 1923 (c. 441, p. 1020), should they enter into said
agreement, they deferred the execution thereof by reason of
said threatened prosecutions and applied to the court for an
order perpetually enjoining said attorney-general and dis-
trict attorney from the threatened enforcement of said Alien
Land Law and the amendments thereto. The averments
here are substantially the same as the averments in *Webb et
al.* v. *O'Brien et al.,* 263 U. S. 313 [68 L. Ed. 318, 44 Sup.
Ct. Rep. 112], and are to the effect that said initiative act
is so drastic and the penalties for its violation are so great
that neither plaintiff may execute the contract for the pur-
pose of testing the validity of said act and its application
thereto, and that, unless the court may determine the validity
of said act and its application, they will be compelled to
submit to it, whether it be valid or invalid. It is the com-
plaint of plaintiffs that they have been unlawfully coerced
by said threats of prosecution from entering into said agree-
ment and are thereby deprived of their property without due
process of law and are denied the equal protection of the
law in contravention to the fourteenth amendment of the
federal constitution. It is further contended that said initi-
ative measure and amendments deny to an ineligible alien
the right to labor or to engage in the common and ordinary
employments of the country.

[1] The right to maintain such a proceeding as here in-
stituted is elaborately discussed in *Terrace et al.* v. *Thompson,*
263 U. S. 197 [68 L. Ed. 255, 44 Sup. Ct. Rep. 15]. It is
not necessary to do more than to cite that case. It is sup-
ported by a long list of authorities.

[2] · The cropping contract or agreement which appellants
desire to execute and which would affect the realty of ap-
pellant Porterfield is not distinguishable in material respects

from the contract construed in *Webb* v. *O'Brien, supra.* We are mindful that the O'Brien contract makes provision for the housing accommodations of the cropper on the premises. A similar provision is not carried into the Mizuno contract. The latter contains a provision that no interest in or possession of the lands is given the cropper "except the right of ingress and egress as shall be necessary and proper for the carrying out this contract." The foregoing quoted clause does not appear in the O'Brien contract. The housing provision, however, is not sufficient to make a material difference. The occupancy, and use of the lands and the privileges incidental thereto by ineligible aliens would have the practical effect of a denial of the use, occupancy, enjoyment, and benefit of the land to the citizen. In all other respects the contracts are substantially the same. The Mizuno contract provides in substance that he shall plant, cultivate, and harvest certain designated garden-truck and vegetables and such other crops as Porterfield, the owner of the soil, may thereafter designate, in a good and farmerlike manner. He shall furnish all necessary tools, farming implements, and all labor necessary to carry out the terms of the contract. He is to keep the banks and bottoms of irrigation ditches on and adjacent to or tributary to said lands free from weeds and foul growths; to repair and maintain all levees; to prevent the loss of irrigation water and to protect the driveways and roads from overflows and to guard against and protect the property from fires. He is to harvest and pack the crops in accordance with the best standards and prepare said crops for shipping and to haul the same to market. Porterfield is to give to Mizuno sixty per cent of all crops grown upon said lands during the period of the agreement (which is for the term of one year) as compensation for his services. He also grants to Mizuno the right to a division of the crops after the same are harvested and before the removal thereof from the land. In the event that said cropper fails to remove his share of said crops from the premises before the termination of the contract he is granted a reasonable time thereafter to remove the same. The contract contains the provision that "this contract is not intended to create a lease nor to give to the cropper any interest whatever in, or possession of, any of said land except the right of ingress and

egress as shall be necessary and proper for the purposes of carrying out the terms and conditions of the contract during the continuance thereof.'' We have mentioned all of the material portions of the proposed contract which the parties desire to execute.

Respondents contend that the Alien Land Law of this state prohibits the owner of agricultural lands from making a contract such as the one above described with an ineligible alien and cite *Webb* v. *O'Brien*, 263 U. S. 313 [68 L. Ed. 318, 44 Sup. Ct. Rep. 112]; *Terrace* v. *Thompson et al.*, 263 U. S. 197 [68 L. Ed. 255, 44 Sup. Ct. Rep. 15]; *Frick et al.* v. *Webb. et al.*, 263 U. S. 326 [68 L. Ed. 323, 44 Sup. Ct. Rep. 115], as authorities, which, it is claimed, fully and completely justify the institution of the threatened proceedings against appellants should they execute said contract, and admit that it is their intention to proceed against them in accordance with the escheat and forfeiture provisions of said Alien Land Law in the event that appellants as between themselves enter into said contract. Appellants and the *amicus curiae*, on the other hand, insist that the case *In re Okahara*, 191 Cal. 353 [216 Pac. 614], clearly recognizes the right of appellants to enter into said contract and that this court is bound to follow the interpretation placed upon the Alien Land Law by the latter decision, which, as construed by them, permits the making of the proposed contract for the purposes and uses therein set out. There can be no doubt but that the contention of respondents is fully sustained by the decisions of the United States supreme court above cited. *In re Okahara, supra*, relied upon by appellants as ruling the present situation, will be hereafter noticed.

The sections of the Alien Land Law bearing upon the question presented are as follows:

"Section 1. All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, transmit and inherit real property, or any interest therein, in this state, in the same manner and to the same extent as citizens of the United States, except as otherwise provided by the laws of this state.

"Section 2. All aliens other than those mentioned in section one of this act may acquire, possess, enjoy and transfer

real property, or any interest therein, in this state, in the manner and to the extent and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise.''

Sections 7 and 8 of the act provide that any real property or any leasehold, or any other interest in real property less than the fee, acquired in violation of the provisions of the Alien Land Law shall escheat to the state of California and the attorney-general of the state or district attorney of the proper county shall institute proceedings to have such escheat adjudged. Section 9 provides that every transfer of real property, or of an interest therein, though colorable in form, shall be void as to the state and the interest thereby conveyed or sought to be conveyed shall escheat to the state if the property interest involved is of such a character that an alien mentioned in section 2 thereof is inhibited from acquiring, possessing, enjoying or transferring it, and if the conveyance is made with intent to prevent, evade, or avoid escheat as in said act provided.

''Section 10. If two or more persons conspire to effect a transfer of real property, or of an interest therein, in violation of the provisions hereof, they are punishable by imprisonment in the county jail or state penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both.''

''Section 13. The legislature may amend this act in furtherance of its purpose and to facilitate its operation.''

The act closes with a general saving clause to the effect that if any part of it is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portions of the act.

[3] It has been definitely determined that the provisions of the Alien Land Law, to which reference is herein made and which are germane to the questions presented by this appeal, do not offend any clause or provision of the state or federal constitution or violate any treaty obligation or right existing between this country and the empire of Japan. (*In re Y. Akado,* 188 Cal. 739 [207 Pac. 245]; *In re Okahara, supra; O'Brien* v. *Webb,* 263 U. S. 313 [68 L. Ed. 318, 44 Sup. Ct. Rep. 112]; *Terrace* v. *Thompson,* 263 U. S. 197

[68 L. Ed. 255, 44 Sup. Ct. Rep. 15]; *Porterfield* v. *Webb,* 263 U. S. 225 [68 L. Ed. 278, 44 Sup. Ct. Rep. 21]; *Frick* v. *Webb,* 263 U. S. 326 [68 L. Ed. 323, 44 Sup. Ct. Rep. 115]. See, also, *Blythe* v. *Hinckley,* 127 Cal. 431 [59 Pac. 787].)

We think that appellants rely with a greater degree of confidence upon the Okahara case, *supra,* than the real and only question there presented for decision warrants. That case arose out of a criminal prosecution instituted by virtue of the provisions of section 10 of the Alien Land Act and was decided on the basis of a criminal action. In such cases all presumptions arising upon questions of either law or fact must be construed in favor of the innocence of a person charged with crime, if such a construction can be reasonably indulged. Okahara, being restrained of his liberty upon a charge of having feloniously conspired with another to effect *a transfer of an interest in real property* in violation of said act, petitioned this court for the issuance of a writ of *habeas corpus,* which was granted, and we ordered his discharge. The contract which formed the basis of the criminal prosecution in that case is different in material respects from the one in the instant case, as a comparison of the contracts will show. It provided for the clearing of a twenty-acre tract of land and the planting of the same to orchard, for which service Okahara was to receive fifty dollars per acre, all trees to be furnished by the land owner. This provision of the contract undoubtedly constituted a contract of employment. It further provided for the planting between the rows of the fruit trees a designated number of acreage to raspberries, blackberries, strawberries, and garden vegetables. Okahara was to harvest the crops and make delivery of the same at any market or station designated by said land owner. He was also to furnish all labor, tools, and machinery necessary for the performance of the terms of the agreement. The products of the soil, including fruits, were to be sold by the land owner on such terms as he should deem best and Okahara was to receive in addition to said fifty dollars per acre for clearing the land and planting the orchard, fifty per cent of the net proceeds derived from the sale of the fruits and farm products. Okahara's share was to be paid to him in cash by the owner thirty days after the sale of said prod-

ucts, certain deductions to be made in favor of the owner for outlays of money made by him for materials furnished, etc. It was expressly stipulated that Okahara was to have access to the land for the purpose of doing the work and "all crops of every nature and character grown thereon were to be the property of the land owner and the contractor (Okahara) shall have no interest, right or claim in or to any part of the said crop but his sole right shall be to the compensation paid by the employer (land owner) as herein provided and the said compensation shall be in payment for all services for said contractor (Okahara) for outlays and expenses paid or incurred by the contractor in or about said work." It was also provided that the land owner might at any time, if dissatisfied with the work or with its progress, immediately terminate the same on ten days' written notice by paying to Okahara compensation equal to the usual wages paid for similar work in the same neighborhood. The contract was nonassignable without the consent of the land owner. This court, upon considering the matter before it, said: "The only question before us is whether the acts, purposes and objects as shown upon the face of the instrument are, in fact, such acts, agreements, purposes and objects as are forbidden by *Section ten* of the Alien Land Law. If by a reasonable construction of the agreement, the case is fairly brought within the inhibition of the law the petitioner should be remanded, otherwise he must be discharged." In the concluding paragraph of the decision we find this clause: "We can only say that we have examined the questions presented with care and feel convinced that we are not authorized by the language of the act *under which the charge is laid* to hold that the facts as presented are sufficient to justify us in holding that petitioner has committed a public offense." (Italics ours.)

Again, it will be noticed that in a statement of the case at the very outset we used the following language: "The gravamen of the offense charged is that on March 20, 1922, petitioner, *in furtherance of an unlawful conspiracy,* executed an agreement and contract with said Vicencio whereby said Vicencio transferred to petitioner for a term of five years *an interest* in a certain parcel of agricultural lands containing twenty acres, situate in the county of Placer. The por-

tions of the act which bear directly on the case are Sections 2 and 10, which provide as follows'': (Said sections follow.) (Italics supplied.) In order to determine whether or not a conspiracy *to transfer an interest in real property,* as defined by the penal sections of said act had been committed, it was necessary to consider the effect of section 2. The power of the court to impose imprisonment, however, as a penalty for the violation of the act must be measured by the language of section 10, under which the prosecution was laid. This court held that the contract in the Okahara case failed to establish a criminal conspiracy *to transfer an interest in real property* and the authorities cited to the point whether a cropper actually has an interest in the land upon which the crops are grown must be regarded as limited to that issue. But here we have presented practically the identical question, referable to the same section of the act that was presented to the United States supreme court in the several cases heretofore cited. Mr. Justice Butler in *Webb* v. *O'Brien, supra,* in distinguishing the Okahara case from *Webb* v. *O'Brien,* said:

"The decision of the Supreme Court of California *In the Matter of Okahara, supra,* a *habeas corpus* case, does not support the appellee's contention. In that case an ineligible Japanese was held on a warrant charging him with a conspiracy to effect a transfer of real property in violation of Section 10 of the Alien Land Law. The gravamen of the offense charged was that Okahara, in furtherance of the conspiracy, executed a contract with another, whereby the latter transferred to him for a term of five years an interest in 20 acres of agricultural land. The only question before the court in that case was whether the contract amounted to a transfer of real property or of an interest therein in violation of section 10. The court said: ' . . . The instrument before us cannot be characterized as a lease or transfer of any interest in real property because it lacks many of the essential elements of a lease, while on the other hand it bears all the characteristics of an agreement of hiring. But if it cannot be said to be an agreement of employment pure and simple, it cannot under any rule of construction be held to be more than a cropping contract.'

"After referring to the terms of the contract and reviewing the authorities, it said: 'The argument that the law forbids the making of a contract of employment or agreement to till the soil on shares can only be sustained by adopting the theory that the particular agreement under consideration transfers an interest in land.'

"The court held that the contract did not violate section 10 and discharged Okahara. The contract in that case differs in important particulars from the one before us; but, in the view we take of the case, we need not determine whether, within the meaning of the act, the contract between O'Brien and Inoye, if executed, would effect a transfer of an interest in real property. The question in this case is not whether the proposed contract is prohibited by section 10, but it is whether appellees have shown that they have a right under the Constitution or treaty to make and carry out the contract, and are entitled to an interlocutory injunction against the officers of the state. A negative answer must be given.

"The privilege to make and carry out the proposed cropping contract, or to have the right to the possession, enjoyment and benefit of land for agricultural purposes as contemplated and provided for therein, is not given to Japanese subjects by the treaty. The act denies the privilege because not given by the treaty. No constitutional right of the alien is infringed. It therefore follows that the injunction should have been denied."

[4] The decision last above cited effectually disposes of appellants' argument to the effect that the denial to them of the right to make and carry out a cropper's contract also denies to them the ordinary means of earning a livelihood in the following unmistakable language: "The right to make and carry out cropper contracts such as that before us is not safeguarded to ineligible aliens by the constitution. A denial of it does not deny the ordinary means of earning a livelihood or the right to work for a living. The practical results of such contract is that the cropper has use, control and benefit of land for agricultural purposes substantially similar to that granted to a lessee. Conceivably, by the use of such contract, the population living on and cultivating the farm lands might come to be made up largely of

195 Cal.—6

ineligible aliens. The allegiance of the farmers to the state directly affects its strength and safety. (*Terrace et al.* v. *Thompson, supra.*) We think it within the power of the state to deny to ineligible aliens the privilege so to use agricultural lands within its borders." It is apparent that the decision rests largely upon broad principles of national safety and public welfare. Unquestionably the farming of lands by ineligible aliens would give them a use, occupancy, and benefit of agricultural lands which in effect would amount to a deprivation of its use, enjoyment and occupancy by the citizen. Any other theory would be incompatible with the occupation of husbandry. To all practical purposes this would, *pro tanto,* constitute a withdrawal of agricultural lands from the use, occupancy, and benefit of the citizen. Furthermore, it is said in *Webb* v. *O'Brien, supra,* that the contract in that case, which cannot in a practical sense be distinguished from the contract in the instant case, will give to the ineligible alien a right to use and enjoy the benefit of the land for agricultural purposes. And that is so "notwithstanding other clauses of the contract to the effect that the general possession of the land is reserved to the owner, that the cropper shall have no interest or estate whatever in the land, that he is given one-half of all crops grown as compensation for his services and labor, and that division of the crops is to be made after they are harvested and before their removal from the land." [5] Racial distinctions may furnish legitimate grounds for classifications under some conditions of social or governmental necessities. (*Piper* v. *Big Pine School District of Inyo County et al.,* 193 Cal. 664 [226 Pac. 926].) [6] Ineligible alienage is not deprived of any constitutional or treaty rights by reserving the agricultural lands of the nation for the use, occupancy, benefit, and enjoyment of its citizens or those eligible to become citizens, nor denied the right to engage in the ordinary employments or means of earning a livelihood. The ordinary employments and occupations by which a livelihood may be earned remain open to the ineligible alien. The principle of constitutional law which forms the basis of the instant case differs from *Truax* v. *Raich,* 239 U. S. 33 [Ann. Cas. 1917B, 283, L. R. A. 1916D, 545, 60 L. Ed. 331, 33 Sup. Ct. Rep. 7, see, also, Rose's U. S. Notes],

strongly urged by appellants as being in their favor, as pointed out in *Webb* v. *O'Brien, supra.*

The many insistent efforts of the land owners and ineligible croppers to frame a contract that will accomplish the obvious purpose of the contracting parties as interpreted by the recent decisions of the supreme court of the United States have been thus far futile and must continue to be so under the construction which is compelled by the Alien Land Act. "The treaty gives no permission to enjoy, use, or have the benefit of land for agricultural purposes. The privileges granted by the act are carefully limited to those prescribed in the treaty. The act as a whole evidences legislative intention that ineligible aliens shall not be permitted to have or enjoy any privilege in respect to the use or the benefit of land for agricultural purposes. And this view is supported by the circumstances and negotiations leading up to the making of the treaty." (*Terrace et al.* v. *Thompson, supra.*)

If a civil action had been instituted against Okahara under the general provisions of the act, as was done in the O'Brien case, instead of a criminal prosecution under section 10 thereof, and it had been carried to the United States supreme court by a writ of error, there is but little doubt that that court would have ruled as it did in the O'Brien case. This court in deciding the Okahara case adopted a portion of the language of the United States district court for the northern district of California (three judges sitting) in *Webb* v. *O'Brien*, which decision was afterward appealed to the United States supreme court and by it reversed. The reasoning of the United States district court was held to be unsound upon appeal even as applied to the general provisions of the act upon which a civil action was based. If the reasoning of the United States district court was faulty when applied to questions directly involved in the issues of that case and its conclusion was wrong, surely it would have no persuasive force even by way of analogy in determining whether or not a conspiracy to commit the crime defined by section 10 of the act had been committed. As stated by Mr. Justice Butler, the sole question involved in the latter case was whether a conspiracy had been formed to transfer an interest in real property—concretely stated, whether the cropping contract in that case conveyed to the cropper an

interest in real property. Anything said by way of argument or injected into the decision by way of illustration and not bearing on the offense charged was *obiter dictum* and is not to be followed here. A different question is presented by this proceeding.

The questions presented by the issues of the instant case are not ordinary questions involving property rights as between individuals merely, but they are questions which affect our relations as a nation with foreign countries. This alone furnishes a sufficient reason for the adoption by this court of the construction placed upon the Alien Land Act by the supreme court of the United States.

The general provisions of the initiative Alien Land Law being sufficiently comprehensive to include every essential element of the instant case, and section 10 of said act not being in anywise involved, the question whether it was within the power of the legislature to adopt the amendment (Stats. 1923, p. 1020) which, it is claimed by appellants, attempts, unlawfully, to extend the scope of the inhibitive provisions of the original act, contrary to the express provisions of the act itself, is a question which does not arise in the instant case and what we might say in reference to it here would be but mere *dicta.*

Judgment affirmed.

Myers, C. J., Lennon, J., Shenk, J., Waste, J., and Richards, J., concurred.

Lawlor, J., concurred in the judgment.