## O'BRIEN et al. v. WEBB, Atty. Gen. of California, et al.

### (District Court, N. D. California, Second Division. December 20, 1921.)

### No. 654.

Aliens ⚖═6(1)—Cropping contract with alien held not to create a tenancy, which vested him with an "interest in the land," in violation of alion land law.

A contract between an owner of land and an alien Japanese resident, designated as the "cropper," by which the owner employed the cropper to cultivate the land for four years, with the right to occupy a house thereon, using the horses, machinery, and tools of the owner, who reserved general possession of the land, the cropper to receive for his services one-half of the crops after they were harvested, "provided that the cropper shall have no interest or estate whatsoever in the land described herein," *held* not to create the relation of landlord and tenant, nor to vest the alien with an interest in the land, which rendered the contract invalid, as in viola-tion of the California Alien Land Law of November, 1920.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interest.]

In Equity. Suit by J. J. O'Brien and J. Inouye against U. S. Webb, Attorney General of the state of California, and another. On motion for preliminary injunction. Granted.

Albert H. Elliot and Guy C. Calden, both of San Francisco, Cal., for plaintiffs.

U. S. Webb, Atty. Gen. of California, and Frank English, Deputy Atty. Gen. of California, for defendant Webb.

C. C. Coolidge, Dist. Atty., of San Jose, Cal., pro se.

Before HUNT, Circuit Judge, and BLEDSOE and DOOLING, District Judges.

DOOLING, District Judge. This action is brought by plaintiffs O'Brien, a citizen of the United States, and Inouye, a subject of the emperor of Japan lawfully residing in the state of California, to re-strain the defendants U. S. Webb, Attorney General, and C. C. Cool-idge, district attorney, from attempting to enforce as against them the California Alien Land Law (St. 1921, p. lxxxiii) if they enter, as they desire to do, into a certain contract, a copy of which, designated a cropping contract, is attached to the bill. It is claimed by plaintiffs that the act in question violates certain provisions of the Constitution of the United States, and is in conflict with treaty stipulations and with certain named sections of the Revised Statutes. It is further claimed that, even if the act itself be held to be valid, yet the contract which plaintiffs desire to make is not prohibited thereby, although this fact will not deter defendants from prosecuting them, if such contract be made.

The act in question provides:

"Section 1. All aliens eligible to citizenship under the laws of the United States may acquire, possess, enjoy, transmit and inherit real property, or any interest therein, in this state, in the same manner and to the same extent as

---

⚖═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

citizens of the United States except as otherwise provided by the laws of this state.

"Sec. 2. All aliens other than those mentioned in section one of this act may acquire, possess, enjoy and transfer real property, or any interest therein, in this state, in the manner and to the extent and for the purpose prescribed by any treaty now existing between the government of the United States and the nation or country of which such alien is a citizen or subject, and not otherwise."

"Sec. 10. If two or more persons conspire to effect a transfer of real property, or of an interest therein, in violation of the provisions hereof, they are punishable by imprisonment in the county jail or state penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both."

We have held in the case of Porterfield and Mizuno v. Webb et al., 279 Fed. 114, involving a lease, and submitted with the present action on motion for a preliminary injunction, that the act itself contravenes no constitutional provision, violates no treaty stipulation, and conflicts with no statutory enactment. The real question for determination, then, is whether or not the contract in question is one the execution of which is prohibited by the Act.

The contract provides:

That the owner (O'Brien) of a certain tract of land wishes to "employ cropper (Inouye) for a period of four years as an employé, for the purpose of planting, cultivating, and harvesting crops to be grown on owner's land" under the terms thereafter set forth. By the terms the "owner" agrees to "employ" the cropper, and not to interfere with him in the planting, cultivating, and harvesting of the crop, and to protect cropper during the existence of the contract against interference by any person, "the general possession of the land above described being reserved to owner." Owner agrees to provide and maintain housing accommodations for cropper; also, to furnish necessary implements, tractors, and gasoline for the operation of the tractors, to furnish horses and feed for planting, cultivating, and harvesting the crops provided for, to furnish all things necessary for the proper farming of the land, and also to haul the crop, when properly prepared by cropper for hauling and shipping, to the packing house or station; to "permit" cropper to work the land on the conditions set forth, provided "cropper shall have no interest or estate whatsoever in the land described herein"; to give to cropper 50 per cent. of all crops grown during the period of the agreement, "as compensation for the services and labor of the cropper as herein set forth"; also, "to grant to the cropper his right to a division of the crop after it is harvested and before its removal from the land, provided that the cropper exercises his option thereunto"; and, in the event of the exercise of such option, to grant to cropper the right to remove from the land his share of the crops within a reasonable time, even though said time should extend beyond the term of cropper's employment; also to grant to cropper the right to carry out the terms of his agreement by employing such agents or employés as he sees fit, and to give them free ingress or egress over the property, and the right to live thereon without let or hindrance.

The cropper agrees to plant, cultivate, and harvest strawberries, raspberries, loganberries, and vegetables, in good farmerlike manner; to maintain and keep up the personal property, and return to the owner implements which may have been supplied to him in good condition; to keep the irrigation ditches and levees in good order, and prevent loss of irrigation water; to harvest all crops when ripe, and to pack and prepare the same for shipping and transportation if necessary. It is mutually agreed that, if the land is sold during the agreement, the owner may terminate the agreement by paying the cropper for his services at the rate of $100 per month from the beginning of the calendar year in which the agreement is terminated, together with moneys expended by the cropper, for labor and material furnished for planting and cultivating. Further mutual agreement is that in case of breach on the part of the owner, or in case of any hindrance with or prevention of farming upon any part of said land, owner agrees to pay the cropper for money expended by cropper for planting and cultivation of the then growing crops, together with 20 per cent. of the moneys expended by the cropper, as liquidated damages for the cancellation of the agreement.

In a cropping contract the cropper has no estate in the land. He may be physically upon the land, and have possession of the crops, yet such possession is that of a servant, who receives his pay in a certain proportion of the crop. Whether an agreement for the occupation of farming land is a lease or a crop contract depends on the intention of the parties, as gathered from the words of the agreement when it has been reduced to writing. In the contract under consideration nothing is said about leasing or letting the premises, or of paying anything as rent, and so far as the language used aids us it is merely an agreement to till the land on shares and divide the crop, which would make the parties tenants in common of the crop while growing and when matured. Connell v. Richmond, 55 Conn. 401, 11 Atl. 852. The length of the term may be considered, but it is not a determining factor. Walker v. Fitts, 24 Pick. (Mass.) 191; Guest v. Opdyke, 31 N. J. Law, 552; Aiken v. Smith, 21 Vt. 172. In the last case the court held there was no tenancy, although the letting for crop rent was to continue for five years, yet the contract contained technical words appropriate to a lease—i. e., the words "agree to let."

Under the instrument under consideration the cropper has no interest in the land, merely receiving his share of the crop as the price of his labor. The "general possession of the land" is expressly reserved to the owner, and he alone could maintain trespass. Adams v. McKesson, 53 Pa. 81, 91 Am. Dec. 183; Williams v. Cleaver, 4 Houst. (Del.) 453. The duty of the owner is to divide off to the cropper his share of the crop, and until the cropper exercises his right to a division of the crop after it is harvested and before removal, the whole title remains in the owner of the land. McNeeley v. Hart, 32 N. C. 63, 51 Am. Dec. 377; Brazier v. Ansley, 33 N. C. 12, 51 Am. Dec. 408.

An agreement by which the one party is to furnish the land and the stock and the other to do the work, the crop to be divided equally between them, is one of hiring, and not of landlord and tenant. Hunt

v. Mathews, 132 Ala. 286, 31 South. 613. In Hudgins v. Wood, 72 N. C. 256, the agreement referred to services, and the landowner agreed to supply house and teams and to give one-half of the crops in pay for services. It was held there was no tenancy.

In Taylor v. Donahoe, 125 Wis. 513, 103 N. W. 1099, there was a written agreement for the cultivation of certain lands owned and controlled by Donahoe, whereby Finnegan was to cultivate, do all work of raising crops and marketing during his term of service, to furnish certain stock, seeds, etc. There were stipulations regarding sharing expenses and Donahoe was to pay Finnegan, "in full compensation for his services, one-third of the crops." The agreement was characterized as a personal agreement. Finnegan was to have the use of the dwelling house on the lands, except parts which Donahoe reserved for his own use. Justice Winslow said:

"The distinction between a tenant and a cropper is that a tenant has an estate in the land for a given time, and a right of property in the crops, and hence makes the division thereof between himself and the landlord in case of an agreement upon shares, while a cropper has no estate in the land, nor ownership of the crops, but is merely a servant, and receives his share of the crops from the landlord, in whom the title is. It is always a question of construction of the agreement under which the parties are acting. The agreement in question here seems to us to be very clear and definite upon the subject. It nowhere refers to Finnegan as a tenant, but specifically refers to his work as 'service,' and expressly provides that Donahoe shall pay him for his services by certain shares of the crops, and that the possession of the land and ownership of the crops are to remain in Donahoe, and that Finnegan is merely to be an employé in the tilling of the land and caring for the stock. Language could hardly be plainer or more appropriate for the purpose of creating a cropper arrangement."

In Williams v. Cleaver, 4 Houst. (Del.) 458, supra, the statute of the state was recognized as providing that any contract or consent pursuant to which the tenant should enter into or continue in possession of lands under an agreement to pay rent should be a demise, but, where there was no agreement between the owner and him who entered into possession that the latter was to pay rent for use and occupation, and the right of tilling and cropping, in that event, though he were let into possession for that purpose, it would not be a demise or a renting within the meaning and definition of the statute; the court saying:

"But if he was not in possession, as before stated, under an agreement to pay rent to the defendant, but only as a cropper to be paid for his services as such, in one-third of the produce, he would not be entitled to maintain the action" of trespass.

In Currey v. Davis, 1 Houst. (Del.) 598, there was a verbal agreement between the owner and a man, whereby the latter should till and cultivate for a proportion of the crop. The court held that the facts did not establish a demise of the premises, so as to establish the legal relation of landlord and tenant, but that the agreement was nothing more than, and should be considered only as, an agreement for raising at their mutual expense and labor a crop of wheat on shares between them. In the agreement itself nothing was said about leasing or letting

or about rent, "and this would constitute them owners or tenants in common of the crop while growing and when matured until it was severed and so apportioned between them," etc.

Bernal v. Hovious, 17 Cal. 542, 79 Am. Dec. 147, was a case where the Bernal agreement in relation to use and cultivation between the parties was called a lease by the parties. Under its terms Vasques was to furnish the seed, two teams, and sacks, and Bernal was to do the work and to give him for the use of the land one-third of the grain raised. Field, C. J., held that, although the parties designated the agreement as a lease, it was not one, but was a contract for the working of the farm upon shares, and cited Putnam v. Wise, 1 Hill (N. Y.) 235, 37 Am. Dec. 309, and Caswell v. Districh, 15 Wend. (N. Y.) 379, to the effect that Vasques and Bernal were tenants in common of the grain to be divided. Clarke & Kane v. Cobb, 121 Cal. 595, 54 Pac. 74, referred to Bernal v. Hovious as containing facts different from those presented in the case under consideration, and regarded the case then at bar as presenting a relationship of landlord and tenant rather than as a cropping contract. But in that case the land was, by provision of the contract, "demised and let for a term of years."

In Walls v. Preston, 25 Cal. 59, plaintiff's intestate "demised, leased, and to farm let" the premises, "to have and to hold" for two years. Preston covenanted not "to underlet" the premises "or yield the possession thereof to any but Vera." The court, recognizing that parties could make a lease or an agreement constituting them tenants in common of the crops, and at the same time provide that the owner or occupant might hold possession, or that both might be tenants in common of the land during the term mentioned in the agreement, held, however, that in that instance the parties intended to make a lease, and that the instrument was a lease.

In State v. Jewell, Collector, 34 N. J. Law, 259, there was an agreement whereby one Price cultivated and received for his labor and services as farmer a certain share of the products, and he lived in a small house on a part of the farm. The court said a contract between the owner of lands and a third person that the latter shall work the farm on shares, the products to be divided between them, is not a lease.

"Such an arrangement does not create the relation of landlord and tenant. The occupier, by virtue of an agreement of this kind, becomes simply a tenant in common with the other contracting party of the growing crops, and this joint interest continues until it is severed by a division. * * * An agreement between the owner and A., that the latter shall manage the farm for a stipulated sum per week, and be allowed to reside in and have the use of a dwelling house and furniture therein, free of rent, is not a demise of the house; the occupation of it being a mere remuneration, in part, for services."

In Guest v. Opdyke, 31 N. J. Law, 552, there was a verbal agreement to the effect that one party should work the farm on shares, with right of occupancy of part of the house and provision for division of part of the crops. The court held that the position that one of the parties was the tenant of the other was not tenable; that the arrangement strictly speaking, was not a lease, nor did it constitute the defendant a tenant.

"The opposite doctrine would be attended with much inconvenience, if not positive mischief. Landlords are induced to put out their farms, in this mode, to tenants who are poor, relying, as they imagine, on the certainty that their share of the produce cannot be diverted or in any wise encumbered; whereas, if these agreements are complete leases, the title to the crops produced vests in the occupier, and the landlord would have no claim upon them until a division should have been made, and then his share would come to him as a reditus, or rent. Such is not the light in which the law regards this species of contract. On the contrary, the true construction is that by virtue of such agreements the occupier becomes simply a tenant in common with the other contracting party of the growing crop, and that this joint interest continues until it is severed by a division."

In Aiken v. Smith, 21 Vt. 172, supra, the court said that under the facts it was difficult to determine with precision what was the exact relationship of the parties, but it is to be observed that in that case Smith agreed to let his farm for five years, Austin to take certain produce and to do certain repairs. The court held, however, that although Austin had an interest in the land, and was not merely the servant, and did not occupy for hire, but had a right to occupy, it was yet quite apparent that the intention of the parties was not to constitute a lease, and that, while certain words were used which were apt to make a lease, the court would not treat it as such, but would regard Austin, not as the occupant for a certain term, but as a quasi occupant at will, so long as the parties should agree and be satisfied, not exceeding five years.

Caswell v. Districh, 15 Wend. (N. Y.) 379, referred to in cases above cited, seems to run through the books as a leading one. There plaintiff, as executrix, brought an action of assumpsit against Districh for rent. Relying upon an agreement whereby testator agreed to let the defendant have his farm for one year, Districh to farm it and give one-third of the crops, defendant insisted that the instrument was an agreement to work on shares, and not a lease securing rent, and that an action for rent would not lie. The trial court granted a nonsuit, and the Supreme Court held the agreement was a letting upon shares and technically not a lease; that there was nothing to indicate that the stipulation for appropriation of the crops was by way of rent, and that it was material that this view should be maintained, "unless otherwise clearly expressed," for then the landlord would have an interest to the extent of his share in the crops, whereas, if it is deemed rent, the whole interest belongs to the tenant until a division.

"Where a farm is let for a year upon shares, the landlord looks to his interest in the crops as his security, and thereby is enabled to accommodate tenants who otherwise would not be trusted for the rent."

In Jones on Landlord and Tenant, § 49, the author lays it down that, if one be hired to work land, receiving for his compensation part of the produce, he is a cropper, and not a tenant, having no interest in the land, but receiving his share as the price of his labor.

"The possession is still in the owner of the land, who alone can maintain trespass; nor can he distrain, for he does not maintain the relation of landlord and tenant."

In Warvelle on Ejectment, § 26, the author says that it is common for persons to enter into agreements for the cultivation of land on shares, one person contributing the use of land, while another plants and cultivates the crop, which, when harvested, is divided between them.

"It is well settled that such an agreement does not create a tenancy of any kind on the part of the cultivator. At best he is only a tenant in common of the crop, which is generally regarded as personalty, and the legal possession of the land is in the owner."

Taylor, Landlord and Tenant, vol. 1, § 24a, says that, while the tendency of the later cases is to construe the agreement as a lease, whenever rent as such is reserved, or apt terms of demise are employed, or the intention to create a lease is clearly to be inferred from the words, yet if there appears no agreement for rent, demise, or occupation, but merely for services to be paid for by part of the crop, the occupant for purposes of cultivation is merely a cropper, having no interest in the crops until division.

In Pearson v. Lafferty, 197 Mo. App. 123, 193 S. W. 40, the Supreme Court referred to the divergences of opinion as to the ownership of the crops, but said the trend is to hold that a contract whereby one is allowed the use of land to cultivate, the owner to have a share of the produce for its use, will in general, at least, create a tenancy in common in the growing crop, and that this is so, whether the agreement operates as a lease or a mere cropping contract. The contract there considered was regarded as a cropper's contract.

From this general résumé of cases and consideration of the contract under investigation, it appears that the intention of the parties, as far as it can be gathered from the instrument itself, is to make a cropper's contract and not a lease. There is nothing to prevent an owner and a farmer from agreeing to a cropper's contract to extend over a period of years, and where, as here, both enter into it with the knowledge that the one party can, under the law of the state in which the contract is made, have no interest in the realty and can make no lease of the realty, a forced construction should not be put upon the contract, in order to bring it within the prohibition of the law.

It would be indeed a strain to say that an alien may not enter into a contract for agricultural purposes; unless, of course, the law is very clear and unambiguous in preventing him from doing so. Being lawfully within the United States and lawfully an inhabitant of the state of California, his right to the ordinary pursuit of agriculture is not to be deemed curtailed, provided, always, he does not acquire an interest in the land which he is cultivating. That being so, and both he and O'Brien having the right to enter into a cropper's contract, carrying no interest in the land, and there being nothing in the agreement under consideration which on its face shows fraud or bad faith, and nothing which indicates that the parties intend to make a lease, the court should not say that the agreement is other than what it purports to be; that is, an agreement for cropping, with general possession and ownership in O'Brien, and with the kind of crops specified that the alien shall raise, his share of which is to be granted

to him by the owner, after the crop is harvested. If such contract had been entered into in California before the adoption of the Alien Land Law, it is very doubtful whether any court would ever have been asked to declare it other than a cropper's agreement. The great purpose of the statute of California was apparently to prevent ownership and legal interest in farming lands from passing to aliens who never could become citizens; and there is nothing from which it can be legitimately inferred that the design of the law is to prevent an alien from entering into a cropping agreement whereby he gives his labor for a share in the crops to be raised.

Assuming for the instant that the state has the power to inhibit an alien inadmissible to citizenship from making a contract to farm on shares, it seems quite clear that the statute under consideration has not attempted to make such a contract unlawful. Rather does it seem that, by expressing only prohibition against transferring land or an interest therein, the framers of the statute meant to go no farther, and not to prevent cropping agreements, whereby the labor by the alien may not be interfered with. Such agreements in this state are, and have been for years, well known, and, if it were intended to include them within the statute, it would have been a very simple matter to have embraced them within the expressed provisions of the law. The most that can be conceded to the position of the state authorities is that it is very doubtful whether the contract under consideration pertains to a transfer of an interest in land, and under such circumstances landowners and aliens should not be subjected to numerous and state-wide prosecutions for entering into similar contracts, until it has been determined by the appellate tribunals that such contracts are prohibited. That may readily be determined in this action, without a multiplicity of prosecutions. If such contracts are ultimately held to be unlawful, it means only that prosecution of those who have made them has been for a short time postponed. If they are ultimately held to be lawful, it means that individuals who have broken no law shall have been spared harassing trials, and the state futile, and it may be expensive, prosecutions.

Holding these views, we are of the opinion that the preliminary injunction prayed for should be granted; and it is so ordered.

BLEDSOE, District Judge (concurring). The court, in the companion case brought in the Southern District of California (Porterfield and Mizuno v. Webb, as Attorney General, 279 Fed. 114), having held the Alien Land Law constitutional and valid, the proper construction of the so-called cropper's contract herein, with a view to determine whether it violate such law, is really a local, as opposed to a federal, question. Its decision, however, by this specially constituted tribunal, under the circumstances, seems proper. L. & N. R. R. Co. v. Garrett, 231 U. S. 298, 34 Sup. Ct. 48, 58 L. Ed. 229; Siler v. L. & N. R. R. Co., 213 U. S. 175, 29 Sup. Ct. 451, 53 L. Ed. 753.

The contract here, in my judgment, is not to be measured by the usual yardstick—the intent of the parties as gathered from the language used. It was not entered into in the ordinary course of business

by men dealing at arm's length. To my mind it exhibits a subtle attempt to save the substance through the sacrifice of the form. Read in the light of the surrounding circumstances—the attack on the constitutionality of the law and the numerous sorts of farming contracts recited in the complaint as having been passed upon adversely by the Attorney General—it indicates a studied effort on the part of the signatories to negotiate a contract which, while preserving to the alien all the substantial privileges of a lease, yet, through the efficacy of mere words, would protect him and his landlord against a violation of the law in question.

If the contract is one merely of employment—a cropping contract—why did the parties find it necessary to agree that the owner of the land should not "interfere with him [the cropper], in the planting, cultivating, and harvesting of the crop *in any way*," and that he should "protect the cropper during the existence of this contract against interference by any person whatsoever"? Why, also, if it was to be an ordinary cropping contract, did the owner specially agree "to grant the cropper the right to carry out the terms of this agreement, by employing such agents or employés as he shall see fit. and give to such agents or employés free ingress or egress from said property, or the right to live thereon *without let or hindrance*"? In the light of these positive specially noted covenants on the part of the owner of the land, how much substance is there to the formal reservation by him of "the *general* possession of the land"? (Italics supplied.)

The only question involved herein is whether the contract set out, if enforced, will serve to enable the alien, Inouye, "to acquire, possess, or enjoy any interest in real property." If it will, or if it will serve to effect a transfer of an interest in real property, even "though colorable in form" (section 9, Cal. Alien Land Law), it is prohibited by the law. In Words and Phrases, vol. 4, p. 3699, it is said that the word "interest" is the broadest term applicable to claims in or upon real estate, in its ordinary signification among the men of all classes. "It is broad enough to include any right, title, or estate in, or lien upon, real estate." The Supreme Court of Massachusetts, in Union Trust Co. v. Reed, 213 Mass. 199, 99 N. E. 1093, said the word "interest," in common speech, in connection with land, includes all varieties of titles and rights, and comprehends estates in fee, for life, and for years, mortgages, liens, easements, attachments, and every kind of claim of land which can form the basis of a property right.

We have in this case actual possession, uninterfered with and unhindered, for a full period of four years, of a particularly described tract of agricultural land, being granted to the alien and to his agents and employés, by a contract in writing, together with the further right, within a reasonable time after the termination of the contract, to return upon the land for the purpose of removing his half of the crops to be grown thereon. It seems clear to me, despite the actual words used to evidence the agreement, that the alien, in pursuance of such contract, will be in enjoyment of an interest in—an enforceable right in and to—the land in question.

Surely the alien and his employés would be enabled to maintain an action for trespass (Lightner Min. Co. v. Lane, 161 Cal. 689, 120 Pac. 771, Ann. Cas. 1913C, 1093), a right under the circumstances possibly not open to the owner (Uttendorffer v. Saegers, 50 Cal. 496). Tiffany in his work on Real Property (volume 1, p. 121), says:

"If the effect of the arrangement is to give to the cultivator the possession of the land, the exclusive possession, as it is frequently termed, a tenancy is created."

If the right of a cultivator of land to cultivate it without interference "in any way," "by any person whatsoever," and the right of his various employés to live on the land "without let or hindrance" for a period of years, does not involve an exclusive possession on his part, it is difficult to characterize the real nature of the arrangement. The contract does contain, however, the following portentous language:

"Provided that the cropper shall have *no interest or estate whatsoever* in the land described herein." (Italics supplied.)

If this clause truly reflects the real nature of the arrangement entered into, and be not overcome in effect by other provisions inconsistent therewith, the contract is not invalidated because of the prohibitions of the Alien Land Law. Without attempting to construe the contract definitively, in the light of this and other provisions, I am persuaded that the clause quoted will operate as an estoppel, in favor of either party to the contract, no less than in favor of the state, in the event, under appropriate proceedings, a right in the land on the part of the alien should be asserted.

For this reason, I concur in the judgment.