[Sac. No. 4148. In Bank.—May 29, 1929.]

CALIFORNIA DELTA FARMS, INC. (a Corporation), Respondent, v. CHINESE AMERICAN FARMS, INC. (a Corporation), Appellant.

A. B. Bianchi, Manson & Allan, Albert H. Elliot and Bianchi & Hyman for Appellant.

Nutter, Hancock & Rutherford, A. P. Hayne, F. Eldred Boland, Knight, Boland & Christin and Brobeck, Phleger & Harrison for Respondent.

THE COURT.—In this cause a rehearing was granted and argument and additional briefs from both sides followed. After careful reconsideration of the issues, we are satisfied with the opinion of the court in bank, written by Mr. Justice Preston, and hereby readopt the same as the opinion of this court herein as follows, to wit:

"The able briefs on file in this cause cover a wide range of subjects, but we will consider only a few of them as we have been led to the conclusion that the appeal is controlled by the provisions of the Alien Land Law, which became effective December 9, 1920 (Stats. 1921, p. lxxxiii), and particularly by section 10 thereof, which reads as follows: 'If two or more persons conspire to effect a transfer of real property, or of an interest therein, in violation of the provisions hereof, they are punishable by imprisonment in the county jail or state penitentiary not exceeding two years, or by a fine not exceeding five thousand dollars, or both.' This provision was broadened to cover any violation of the act by an amendment passed in 1923 (Stats. 1923, p. 1020).

"The complaint in this action sets up a contract of sale and purchase, dated August 1, 1919, between plaintiff and one C. C. Wing, a native-born citizen of Chinese descent, covering 3437.58 acres of agricultural land, situate in San Joaquin county. Said contract provided that the total purchase price should be $893,770.80, $50,000 of which was paid upon execution thereof, and the balance of $651,000 was to be paid in yearly installments terminating January 1, 1928. The final balance of the purchase price including interest remaining due on said date, to-wit: $291,770.20, was to be paid by the assumption and discharge of an assessment made by Delta Farms Reclamation District 2030, amounting to $325,436, then outstanding as a lien upon said land, upon which reclamation bonds, bearing six per cent interest, had been authorized and would be payable in approximately equal amounts annually from 1928 to 1938, inclusive.

"It is further pleaded that all payments called for by said contract were made up to January 1, 1922, on which

date there became due and payable $51,563.70; a like sum on January 1, 1923, and a like sum on January 1, 1924; that the total of said sums, plus interest on contract price and other items due thereunder, less payments amounting in the aggregate to $151,649.63, made thereon, left a balance due of $231,263.42; that plaintiff had demanded repeatedly from said defendant payment of the said installments due on the purchase price, together with interest, assessments and taxes and, after waiting more than thirty days, declared the rights of said defendant under said contract forfeited. The prayer is that said contract be declared no longer binding upon plaintiff; that said defendant be directed to deliver same up for cancellation and that possession of said premises · be ordered surrendered to plaintiff. The complaint was filed September 15, 1924.

"Defendant, in a second amended answer and cross-complaint, admitted said default in payments but set up, as an alleged waiver of plaintiff's right to claim a forfeiture under the contract, certain acts and conduct of plaintiff. The pleading alleges that said C. C. Wing, an American-born Chinese, was acting on behalf of a corporation, to be thereafter organized, and which was later organized and became the defendant herein; that the $50,000 paid upon said contract prior to the formation of said corporation was more than 80 per cent advanced by Chinese aliens, which fact plaintiff well knew, and that after said corporation was formed and transfer of said contract made thereto, although more than 50 per cent of the issued and outstanding capital stock thereof stood of record in the name of native Chinese, eligible to citizenship, nevertheless at all of said times more than 50 per cent of said stock so issued, to-wit: 80 per cent thereof, was actually, equitably and beneficially owned by aliens ineligible to citizenship and this situation continued throughout the time covered by said contract.

"Further, 'that the alien property law of 1913, hereinabove particularly referred to, was changed and a new alien land law passed by initiative proceedings approved by the electors of the state of California November 2, 1920, Statutes of 1921, page lxxxiii, in effect December, 1920, and which said alien land law of 1920 was amended in 1923 by act of the legislature of the state of California and that from and after the time of the effective date of the alien

land law of 1920 the contract and agreement herein referred to as exhibit "A" became impossible of performance, that the agreements, understandings, plan and scheme of the plaintiff and defendant corporations to effect a transfer of the real property mentioned in said agreement became and were and now are in violation of the terms and provisions of said alien land law of 1920 and 1923'; that by reason of said statute respondent was not able to carry out said agreement to convey or transfer merchantable or any title to or interest in the land the subject of the contract; that the agreement had become void in that the consideration therefor had wholly failed; that the terms of said agreement had become impossible of performance on the part of either party; that the objects and purposes of the agreement had become unlawful and this without fault on the part of appellant.

"It was further pleaded that at the time of the commencement of this action, appellant had paid to respondent under said contract the sum of $466,702.26, which sum, with interest thereon, appellant was entitled to have returned to it; that appellant had enjoyed the possession and benefits of said real property during all the times mentioned in the complaint and was ready, able and willing and offered (and alleged that it had theretofore offered also) to return possession of said real property to respondent, together with all benefits and profits which had accrued to it, together with interest at seven per cent from the dates when same was received and to restore plaintiff to its original position and status and to do all things in equity the court might determine to be meet and equitable to restore respondent to its original position, provided respondent pay to appellant the sum of $244,135.99, together with interest at seven per cent per annum, said sum representing the total amount of payments made by appellant on account of said contract, together with the value of improvements made upon said property, after deducting therefrom the proceeds, income, revenues and every other receipt or money accruing to appellant from said possession and farming operations upon said property.

"The prayer of the cross-complaint was that it be decreed, determined and adjudged that there had been a total failure of consideration in connection with said agreement; that

the same had become impossible of performance by the parties; that said agreement be declared of no force and effect in law or equity and that the purposes and objects thereof had become and were unlawful and that said agreement was for that reason void and that said court determine the respective rights of the parties thereto after a full accounting and that equity in the premises be done; that plaintiff have and be restored to possession of said real property upon payment to defendant of the sum of $244,135.99, or such other sum, of greater or lesser amount, based upon a full accounting between the parties.

"Plaintiff filed an answer, denying the allegations of the cross-complaint, claiming, among other things, that it was without any knowledge or information whatsoever relative to the alleged participation of incligible aliens in the transaction and their ownership of stock of defendant; that it was innocent of any intention to violate the provisions of the Alien Land Law; that defendant was an insolvent corporation, without funds or assets other than its pretended interest in said real property, and praying that the prayer of its complaint be granted.

"From the findings and admissions of the pleadings, the following pertinent facts appear: (1) That the majority of the stock of defendant corporation has at all times herein been beneficially owned by Chinese aliens; hence by persons ineligible to citizenship in the United States (numerically the stockholders being about 1000 with 95 per cent aliens, all Chinese); (2) That on December 9, 1920, when said Alien Land Law came into effect, there had been paid to plaintiff on account of said contract the sum of $297,557.21; (3) That up to and including January 1, 1922, there was no dereliction whatever on the part of defendant in making the payments called for by said contracts of sale and purchase; (4) That between January 1, 1922, and the time of commencement of this action, there had accrued upon said contract, and was then due and owing as a balance, the sum of $236,-186.11; (5) that defendant went into possession of said property on January 1, 1920, and remained in possession thereof until the rendition of judgment herein on May 29, 1926; (6) that said property, and the whole thereof, is agricultural land and was during all times herein cultivated by said defendant and its lessees and sublessees as agricul-

tural land; (7) that when said Alien Land Law of 1920 went into effect no particular attention was paid thereto by either party, but defendant, acting in apparent good faith in all other respects, proceeded until January 1, 1922, to carry out literally the terms of said contract, and apparently used its best efforts to continue to comply with said contract, but partially failed, as above noted; (8) that plaintiff in this action likewise gave no heed to the enactment of said statute, the court finding that it had no actual knowledge of the exact alien ownership of said stock; but the court also found that defendant corporation was organized for the purpose of taking over said contract and that it was known to plaintiff that ineligible aliens would be the owners, to some extent at least, of said stock and that 80 per cent of the first payment on said contract was made by persons who were ineligible aliens and that during the whole period between the date of said contract and the commencement of this action, aliens, ineligible to citizenship, were owners and holders of at least part of the stock of said corporation.

"The question for solution is the effect of said section 10 of the Alien Land Act of December 9, 1920, upon the contract here involved. The validity of this section of the act has been upheld (*In re Akado,* 188 Cal. 739 [207 Pac. 245]). Criminal prosecutions have been carried on under it (*People* v. *Cockrill,* 62 Cal. App. 22 [216 Pac. 78]; *In re Okahara,* 191 Cal. 353 [216 Pac. 614]). Prosecution of the seller and buyer under a general conspiracy statute occurred in Washington (*State* v. *McGonigle,* 144 Wash. 252 [258 Pac. 16]).

"The acts of the parties intentionally done with knowledge of the alienage of defendant and in concert to carry out the provisions of this contract were after December 9, 1920, a clear violation of this statute, so clear that it occurs to us that extended discussion is unnecessary. It is true the statute does not punish criminally the substantive act of making or receiving the transfer of title, but it is an accepted holding that an act may be lawful if done by one person and unlawful if done or attempted by a concert of action on the part of two or more persons (*In re Akado, supra,* and, also, 5 R. C. L., sec. 9, p. 1070). It is also true that the successful fruition of a conspiracy is no bar to a prosecution for the conspiracy itself. The completion of this contract would form conclusive proof of a conspiracy

under the act if plaintiff possessed knowledge of the extent of the ownership of defendant's stock by ineligible aliens.

"We then come to the application of the well-known doctrine that 'where a statute pronounces a penalty for an act, a contract founded on such act is void, although the statute does not pronounce it void, nor expressly prohibit it' (*Berka* v. *Woodward,* 125 Cal. 119, 127 [73 Am. St. Rep. 31, 45 L. R. A. 420, 57 Pac. 777, 780]; *Smith* v. *Bach,* 183 Cal. 259, 262 [191 Pac. 14]; *Wallace* v. *Zinman,* 200 Cal. 585, 588 [254 Pac. 946]).

"But counsel for respondent contend that this rule is here inapplicable, stating their views as follows: 'Even if it were true that a criminal conspiracy was consummated by conveying title to an alien, yet under the 1920 law the alien would get a defeasible title and the defect of the title still could not be raised between the parties.' This contention really forms the foundation upon which respondent rests its claims. In other words, it declares the existence of an exception to the general rule and cites in support of this contention such cases as *Suwa* v. *Johnson,* 54 Cal. App. 119 [203 Pac. 414]; *In re Akado, supra; In re Okahara, supra; Mott* v. *Cline,* 200 Cal. 434 [253 Pac. 718].

"In the first mentioned cause the lessor attempted to avoid his lease to a Japanese alien under the provisions of the Alien Land Act of 1913 [Stats. 1913, p. 206], declaring agricultural lands thereafter acquired by aliens ineligible to citizenship subject to escheat at the hands of the state. The court, following some of our own decisions and a score or more from other jurisdictions, said: 'The question presented is not new and the act of 1913 discloses no intention on the part of the legislature to provide any new rule for its determination. It has uniformly been held under the statutes forbidding ownership of land by aliens that an alien grantee takes a defeasible estate, "free from attack by anyone except the government" in a direct proceeding.' (*Suwa* v. *Johnson, supra,* at page 121.)

"It is true that some of the provisions of the 1913 act are carried into the 1920 act, but section 10, above quoted, is entirely new and is *sui generis.* It provides an additional deterrent, one which may reach the owner of the soil about to be conveyed to the alien. It is true that in *In re Akado, supra,* some unfortunate expressions are found, parentheti-

cally intimating that this action might not change the rule announced in *Suwa* v. *Johnson, supra,* in the respect before us, but there is much other language therein found indicating that the legislature was applying a drastic policy 'to prevent any attempts to create relations between such aliens and other persons whereby the title to land would be taken by any other person, and the use thereof would be enjoyed by the alien' (*In re Akado, supra,* pp. 742, 743). 'Furthermore, it is to the interest of the state that all persons owning land should be effectively deterred from attempting to evade or frustrate the provisions of the act forbidding the acquisition of such land by such alien, by means of colorable conveyances and unrecorded trusts.' (*In re Akado, supra,* p. 742.)

"In *In re Okahara, supra,* it is said: 'The purpose of the Alien Land Law, as is well said in *O'Brien* v. *Webb* [279 Fed. 117], *supra,* "was apparently to prevent ownership and legal interest in farm lands from passing to aliens who never could become citizens." '

"And in *Mott* v. *Cline, supra,* at page 445, it is said: 'This question depends largely upon the legislative intent and upon whether or not the objects sought to be attained are within the police power of the state. There is no direct language upon this point, but there is general language which necessarily implies an intention to prevent an executory contract from ripening into a fee simple. . . . It is appellant's view that the option provision has been rendered void by section 10 of the act of 1920, which makes it a crime punishable as a misdemeanor or felony to conspire to effect a transfer of real property or an interest therein in violation of the law. This is the only act that is made a public offense and penalized by imprisonment or fine or both. (*In re Akado,* 188 Cal. 739 [207 Pac. 245].) The exaction imposed for all other violations of the act inhibiting transfers is that the conveyance is rendered void as to the state and the real property escheats to the state upon action brought by the attorney-general or district attorney of the county in which the violation occurs. (*People* v. *Cockrill,* 268 U. S. 258 [69 L. Ed. 944, 45 Sup. Ct. Rep. 490].) Our statute follows the common law as to the escheat proceedings. It cannot be said that Ah Chue violated any provision of the conspiracy section.'

■ ''These authorities not only do not offer comfort to respondent's position but clearly point to the opposite conclusion. We see no room for the contention that this provision is not effective to invalidate any contract made knowingly in defiance of its terms. The object of the law was to strengthen the act of 1913 and to make effective the inhibition against allowing our agricultural lands to get either directly or indirectly into the hands of aliens ineligible to citizenship. This view is confirmed by the act of 1923 (Stats. 1923, *supra*), which, as above noted, extends the provision to cover conspiracies to violate any of the provisions of the act. The executory provisions of the contract before us, if knowingly acted upon, are within the condemnation of this section. The police power is used in its 'highest and truest sense' in confining the ownership of the soil to persons who are and from whom may be made citizens of the republic (*Mott* v. *Cline, supra,* and other cases there cited). We therefore interpret said section of the act as an innovation upon the common law and effective to destroy and render illegal the consideration underlying the executory provisions of the contract before us.

■ ''If respondent knowingly acted with appellant in any effort to effect a transfer of the lands here involved it would be committing an offense. Appellant, which is little less than an aggregation of ineligibles, and the stockholders and agents thereof, would after December 9, 1920, certainly be conspiring to violate said section if it pursued its efforts to obtain title to the lands, and this is true whether the seller was or was not cognizant of the extent of the alienage in the corporate ownership.

■ ''Appellant invokes the rule announced in *Montgomery* v. *Meyerstein,* 186 Cal. 459 [199 Pac. 800], and 195 Cal. 37 [271 Pac. 730], to the effect that if a contract fails for any reason not due to the default of the vendee he may recover from the vendor in an accounting the amount paid on the purchase price less proper credits and setoffs. And under this head it demands an accounting in equity as of December 9, 1920, and a lien on the property for the amount found due it. This, we hold, it is entitled to have. It has already appeared that it was in possession of the lands from January 1, 1920, to the date of the judgment, May 29, 1926.

■ It also appears that subsequent to the effective date

of said act it has paid large sums of money to respondent amounting to some $151,649.63. While appellant is certainly entitled to no affirmative advantage growing out of anything occurring subsequent to December 9, 1920, and while it was proceeding in violation of the statute, still we see no reason resting in law or equity to deny it the rights accruing to any other person or corporation up to said date. And this embraces the right to employ any remedies the law affords to eligible persons to secure those rights. ■■ Under the universal doctrine announced in *Suwa* v. *Johnson, supra,* and *Mott* v. *Cline, supra,* and elsewhere, the contract when made was not void but valid and binding as against everyone other than the sovereign state, which condition obtained until December 9, 1920. Appellant could have legally assigned, prior to said date, its rights under said contract to an eligible person (*Mott* v. *Cline, supra*). ■■ The provisions of section 7 of said alien land act are in part as follows: ' . . . The provisions of this section and of sections two and three of this act shall not apply to any real property hereafter acquired in the enforcement or in satisfaction of any lien now existing upon or interest in such property so long as such real property so acquired shall remain the property of the alien, company, association or corporation acquiring the same in such manner. No alien, company, association or corporation mentioned in section two or section three hereof shall hold for a longer period than two years the possession of any agricultural land acquired in the enforcement of or in satisfaction of a mortgage or other lien hereafter made or acquired in good faith to secure a debt.' (Deering's Gen. Laws 1923, Part One, Act 261, sec. 7, p. 82.)

"Under this section the act itself allows appellant to secure to itself the proceeds of an accounting in equity as to all lawful matters pertaining to said transaction, including the assertion of a lien upon the property for the amount found due, and this carries the right to continue in possession of the property until same is satisfied. But respondent not only denies consolation to appellant from the provision of the act last above quoted but advances a construction thereof which will allow such contracts as we have before us to ripen into full title without penalties, civil or criminal, of said statute. The contention is that in equity the vendee under a contract of purchase is the owner of the property;

hence the exemption of 'the interest' in such real property' is effective to allow the completion of title. We can give this contention no weight.

. ''The equitable doctrine above referred to is sometimes applied, but only to the payments made on the purchase price; the full equitable title matures only upon the full payment of such price (*Montgomery* v. *Meyerstein, supra*). This doctrine would not allow the completion of the contracts before us, as about one-third only of the purchase price had been paid on the effective date of the act. Moreover, this equitable doctrine has often been held inapplicable in the construction of statutes conferring or withholding rights in real property (*Belieu* v. *Powers,* 54 Cal. App. 244 [201 Pac. 620]; *Allen* v. *Wilson,* 178 Cal. 674 [174 Pac. 661]). ■ But the whole contention of respondent is based upon a misconstruction of the language of this proviso. For we construe the meaning to be as though it read as follows: an exemption for 'real property acquired in satisfaction of any lien upon such property or upon any interest therein.' This construction would allow the foreclosure of mortgages and other liens held by the alien, and in so doing would concede to him the right to acquire the property if necessary with the restriction that he must dispose of same within two years after so acquiring it. Still again this question is settled contrary to respondent's contention by the holding in *Mott* v. *Cline, supra,* where it is stated that there is general language which necessarily implies an intention to prevent an 'executory contract from ripening into a fee simple.' It is also stated 'it was the purpose of the act to cut off instanter the right to thereafter acquire the fee.' It is true that the executory contract there under consideration was a lease with an option to purchase. Nevertheless, it was an executory contract based upon a valuable consideration and every reason for applying the doctrine to that contract exists with respect to the contract before us.

■ ''It may be that respondent is not *in pari delicto* with appellant as to matters occurring subsequent to December 9, 1920. If this indeed be true, an accounting as to such matters may be had to ascertain if the value of the use and occupation of this property by appellant is greater than the payments and benefits received from it and, if so, respondent would be entitled to have such excess credited on

its obligation to appellant arising out of payments made and other legal benefits received from it that are properly referable to said contract and antedate December 9, 1920.

■ "The question of rescission and the rules governing this subject are not, strictly speaking, involved here, as the rights of the parties are not determined by these rules. Civil Code, section 3050, governs the situation and provides as follows: 'One who pays to the owner any part of the price of real property, under an agreement for the sale thereof, has a special lien upon the property, independent of possession, for such part of the amount paid as he may be entitled to recover back, in case of a failure of consideration.' (*Montgomery* v. *Meyerstein, supra.*) ■ Although not entitled to the lien, the vendee may, even when in default, have judgment for the purchase money paid if the consideration for the contract has, without his fault, failed (*Merrill* v. *Merrill*, 103 Cal. 287 [35 Pac. 768, 37 Pac. 392]; *Wilson* v. *Smith*, 69 Cal. App. 211, 213 [230 Pac. 963]; *Haile* v. *Smith*, 113 Cal. 656, 664 [45 Pac. 872]).

■ "It is likewise unnecessary to extend this discussion by a consideration of the claim that appellant has estopped itself to resist a forfeiture under the contract by its subsequent conduct. The rule we have invoked is one of public policy which is not controlled by the subsequent conduct of the parties. To give ear to this plea would be to admit life in a contract during the period we have declared it to be illegal for it to operate."

The judgment is reversed, with directions to the court below to proceed in said cause in a manner not inconsistent with the holding herein made.

A rehearing was denied on June 27, 1929, and the following opinion then rendered thereon:

THE COURT.—Respondent has filed a petition for a rehearing in which it renews the contention heretofore made that "Construed as contended for by the defendant, section 10 of the Alien Land Law, 1920 [Stats. 1921, p. lxxxiii] would violate article I, section 10, and article XIV of the amendments to the Constitution of the United States." This contention has had due consideration and the petition for a rehearing is denied.