[Civ. No. 741.   Fifth Dist.   Sept. 22, 1967.]

CALIFORNIA CHICKS, INC., Plaintiff and Appellant, v. WILLIAM VIEBROCK, Defendant and Respondent.

Lerrigo, Thuesen & Thompson and C. Richard Walters for Plaintiff and Appellant.

Muller, Pia & Simmons and Raymond H. Simmons for Defendant and Respondent.

CONLEY, P. J.—This is an appeal from a judgment upholding an affirmative defense tried specially by order of the court in a bifurcated trial for damages for breach of contract. The trial court found the contract upon which plaintiff based its claim for damages, which called for the purchase of eggs, to be unenforceable upon the ground that plaintiff had no farm produce dealer's license. (Agr. Code, § 1263.)

Plaintiff, who was in the business of purchasing chicken eggs, hatching them, and selling one-day-old chicks, entered into a contract with defendant, a poultry breeder and dealer in eggs, for the purchase of hatching eggs. Deliveries were to

be made at specified intervals during the year 1964. The agreement concerned one aspect of a three-way arrangement whereby defendant would produce the eggs, plaintiff would cause the eggs to be hatched and would then deliver one-day-old chicks to Albers Milling Company. Albers, in turn, would deliver the chicks to farmers who contracted to raise the chickens for market. One batch of hatching eggs was delivered by defendant to the plaintiff and paid for in August. At defendant's request, plaintiff agreed that additional deliveries called for by the contract would be deferred until November in order that defendant might make deliveries of eggs to other hatcheries.

Around the first of September, Mr. Fansler, president of California Chicks, Inc., mentioned to defendant, during a casual conversation, that plaintiff was not licensed to buy agricultural produce as required by the Agricultural Code. He said that he learned of this requirement in connection with an unrelated transaction and that, consequently, plaintiff was in the process of obtaining a license. This was defendant's first knowledge that a poultry dealer buying hatching eggs from a poultryman needed a license. Plaintiff obtained a license September 25, 1964, but in the meantime, between September 7 and 10, defendant informed Mr. Fansler by telephone that he would not deliver any more eggs under the contract because plaintiff was not licensed. Plaintiff brought this action for breach of contract.

It is clear that plaintiff was a "dealer" in the purchase of farm produce, within the sense of Agricultural Code sections 1261 et seq., which provide that farm products include, among other things, "all . . . poultry and poultry products." A dealer is defined as "any person other than a cash buyer who solicits, or obtains from the producer thereof title, possession, control, or delivery of any farm product for the purpose of resale or who buys or agrees to buy any farm product from the producer thereof." (Agr. Code, § 1261, subds. (c) and (f) ; 7 Ops. Cal.Atty.Gen. 349.)

It would seem clear, therefore, that the requirements of section 1263 of the Agricultural Code were applicable. That section provides that no person shall act as a dealer without having obtained a license as provided in chapter 6 of division 6 of the Agricultural Code. The applicant must "satisfy the director" of his or its character, responsibility and good faith in seeking to carry on the business for which a license is sought.

Section 1266 of the Agricultural Code requires each applicant to execute and deliver to the director a surety bond in the amount of $2,000 conditioned upon compliance with the provisions of the chapter and upon honest and faithful handling of farm products. The bond runs to the state, for the benefit of every producer-creditor of farm products grown within the state.

Section 1273 provides, in part, that any person who acts or attempts to act as a dealer without a license is guilty of a misdemeanor punishable by a fine of not more than $1,000 or by imprisonment in the county jail for not more than one year, or both (subd. (1)). In addition, an injunction may issue to prohibit continuing violation of the license provisions (subd. (3)), and the director may, in a civil action, recover a penalty of $500 for each violation (subd. (4)).

Section 1263 of the Agricultural Code points out the necessary character and business qualifications of licensees, in part as follows: "Should the applicant be a corporation or partnership, it shall likewise satisfy the director of the character, responsibility, and good faith of any or all persons connected with it in a responsible or managing position, such as manager, superintendent, officer, or director of a corporation, or manager, superintendent, or member of a partnership. Failure of any such person to satisfy the director of his character, responsibility, or good faith may be considered by the director as adverse to a showing of such qualifications by such corporation or partnership. . . .

"Previous conviction of a felony, previous bankruptcy, voluntary or involuntary, or previous violation of this chapter shall be considered by the director as adverse to a showing of such character, responsibility, or good faith on the part of any applicant, or on the part of any manager, superintendent, director, or officer of an applicant corporation, or on the part of any superintendent, manager, or member of an applicant partnership. The same considerations are applicable to an individual applicant who has previously been in a responsible or managing position with a corporation or partnership which has suffered revocation or suspension of license by reason of violation of this chapter or by reason of violation of Chapter 9, Division 6, of the Agricultural Code.

"Any person adjudged a bankrupt, or any person against whose bondsman or bondsmen a claim or claims have been collected by the director in accordance with the provisions of this chapter or Chapter 9 (commencing at Section 1299.18) of

Division 6 of this code, and who has not made full settlement with all producer-creditors, shall not be licensed by the director during the period of three (3) years from the date of such adjudication or collection."

The section further provides for a possible revocation of the license: "Fraud or misrepresentation in making any application shall ipso facto work a revocation of any license granted thereunder."

Thus it is the considered policy of the State of California that dealers in the position of the appellant must have a license supported and backed by a surety bond, in order to carry on business. The qualifications of people and corporations engaged in this work are of the essence, and it is public policy to make sure that no individual or firm which does not possess the necessary qualifications as defined by law, shall be permitted to carry on a business of this type. This conclusion is made certain by the provisions of section 1275 of the Agricultural Code, being part of chapter 6 of division 6 relating to produce dealers: ". . . The provisions of this chapter are enacted in the exercise of the police powers of this State for the purpose of protecting the health, peace, safety and general welfare of the people of this State."

It is true that the Agricultural Code contains no provision prohibiting, in so many words, a produce dealer who has no license from bringing an action upon a contract for the purchase of farm produce entered into by him at a time when he had no license. But as said in *Wood* v. *Krepps,* 168 Cal. 382, 386 [143 P. 691, L.R.A. 1915B 851] : ". . . when the object of the statute or ordinance in requiring a license for the privilege of carrying on a certain business is to prevent improper persons from engaging in that particular business, or is for the purpose of regulating it for the protection of the public . . . , the imposition of the penalty amounts to a prohibition against doing the business without a license and a contract made by an unlicensed person in violation of the statute or ordinance is void."

The situation involved in this case is thus discussed in 12 California Jurisprudence, Second Edition, Contracts, section 72, pages 274-275 : "Purported contracts in direct violation of the terms of an express prohibition contained in a statute are void. . . . To render a contract invalid, . . . the violation must be of some enactment or directive having the force of law."

In 55 American Law Reports, Second Series, page 482, it is said: "As a general proposition, a contract in violation of a criminal statute is void, even though the statute does not in terms so provide and even though it does not by its terms prohibit the act or acts upon which the contract is based."

In *Lewis & Queen* v. *N. M. Ball Sons,* 48 Cal.2d 141, 150 [308 P.2d 713], Chief Justice Traynor calls attention to the fact that a contract of this kind is improper. At page 150 of the opinion it is said: "The reason for this refusal is not that the courts are unaware of possible injustice between the parties, and that the defendant may be left in possession of some benefit he should in good conscience turn over to the plaintiff, but that this consideration is outweighed by the importance of deterring illegal conduct. Knowing that they will receive no help from the courts and must trust completely to each other's good faith, the parties are less likely to enter an illegal arrangement in the first place."

The authorities are legion to the effect that where, as in this instance, it is clear that the Legislature forbids carrying on a business without securing a license, and makes such action a criminal offense, any contract of the kind involved here is illegal.

The trial court merely followed the law enacted by the Legislature in holding that the plaintiff could not recover. It is not necessary to cite all of the cases which so hold; we shall specify a few: *La Rosa* v. *Glaze,* 18 Cal.App.2d 354 [63 P.2d 1181]; *Capitelli* v. *Sawamura,* 123 Cal.App.2d 169 [266 P.2d 939]; *Payne* v. *DeVaughn,* 77 Cal.App. 399 [246 P. 1069]; *Dale* v. *Palmer,* 106 Cal.App.2d 663, 667 [235 P.2d 650]; *Mansfield* v. *Hyde,* 112 Cal.App.2d 133, 139 [245 P.2d 577]; *Albaugh* v. *Moss Constr. Co.,* 125 Cal.App.2d 126 [269 P.2d 936]; *Swanger* v. *Mayberry,* 59 Cal. 91; *Berka* v. *Woodward,* 125 Cal. 119 [57 P. 777, 73 Am.St.Rep. 31, 45 L.R.A. 420]; *Levinson* v. *Boas,* 150 Cal. 185 [88 P. 825, 11 Ann.Cas. 661, 12 L.R.A.N.S. 575]; *Smith* v. *Bach,* 183 Cal. 259 [191 P. 14]; *California Delta Farms, Inc.* v. *Chinese American Farms, Inc.,* 207 Cal. 298 [278 P. 227]; *Severance* v. *Knight-Counihan Co.,* 29 Cal.2d 561 [177 P.2d 4, 172 A.L.R. 1107]; *Napa Valley Elec. Co.* v. *Calistoga Elec. Co.,* 38 Cal.App. 477 [176 P. 699]; *County of Shasta* v. *Moody,* 90 Cal.App. 519 [265 P. 1032]; *Van Wyke* v. *Burrows,* 98 Cal.App. 415 [277 P. 190]; *City of Los Angeles* v. *Watterson,* 8 Cal.App.2d 331 [48 P.2d 87]; *Miller* v. *California Roofing Co.,* 55 Cal.App.2d 136 [130 P.2d 740]; *Sasaki* v. *Kai,* 56 Cal.App.2d 406 [133 P.2d 18];

*Bourke* v. *Frisk,* 92 Cal.App.2d 23 [206 P.2d 407]; *Benane* v. *International Harvester Co.,* 142 Cal.App.2d Supp. 874 [299 P.2d 750]; *Agran* v. *Shapiro,* 127 Cal.App.2d Supp. 807 [273 P.2d 619]; *Richardson* v. *Roberts,* 210 Cal.App.2d 603 [26 Cal.Rptr. 829]; 42 A.L.R. 1226; 55 A.L.R.2d 481 et seq.; 118 A.L.R. 646.

This rule is recognized and upheld in the Restatement of Contracts, section 580, as follows: ''Bargain in Violation of a Statute.

''(1) Any bargain is illegal if either the formation or the performance thereof is prohibited by constitution or statute.

''(2) Legislative intent to prohibit the formation of a bargain, or an act essential for its performance may be manifested by

''(a) express prohibition, or

''(b) making the formation of the bargain or the performance thereof a crime, or

''(c) imposing a penalty for the formation of the bargain or for doing an act that is essential for the performance thereof or

''(d) requiring a license, inspection, or something similar from persons making such bargains or doing acts essential for their performance, or

''(e) other terms of a statute interpreted in the light of the purpose of its enactment.''

The judgment is affirmed.

Gargano, J., concurred.

STONE, J.—I dissent. If the broad language of the majority opinion obtains, all contracts wherein one party is unlicensed under a regulatory licensing statute are ipso facto illegal and unenforceable. Such a broad implication flies in the face of *Lewis & Queen* v. *N. M. Ball Sons,* 48 Cal.2d 141 [308 P.2d 713], one of the cases upon which the majority opinion rests.

Unless the question of enforceability is settled by a specific provision in the licensing act, such as section 7031 of Business and Professions Code, whether a contract is enforceable must be weighed in the light of a number of considerations, summarized in *Lewis & Queen.* There the court said, at page 151: ''In some cases, on the other hand, the statute making the conduct illegal, in providing for a fine or administrative discipline excludes by implication the additional penalty in-

volved in holding the illegal contract unenforceable; or effective deterrence is best realized by enforcing the plaintiff's claim rather than leaving the defendant in possession of the benefit; or the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality. In each such case, how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved.'' (See also *Keller* v. *Thornton Canning Co.*, 66 Cal.2d 963, at p. 967 [59 Cal.Rptr. 836, 429 P.2d 156].)

The import of this language is that in instances where the Legislature has not specified nonenforceability of a contract as a penalty for noncompliance with a licensing statute, the courts are vested with discretion to determine whether, in the light of the facts of a particular civil action, the harsh penalty of unenforceability of contract should be imposed in addition to the criminal and civil penalties available as punishment for a violation of the particular licensing statute involved.

The first of the criteria mentioned in the foregoing excerpt from *Lewis & Queen* is whether ''the statute making the conduct illegal, in providing for a fine or administrative discipline excludes by implication the additional penalty involved in holding the illegal contract unenforceable.''

This test is peculiarly applicable here. As recently as 1963 the Legislature added section 19.5 to the Agricultural Code, which provides: ''It is hereby declared, as a matter of legislative determination, that the provisions of this code are enacted in the exercise of the power of this State for the purposes of promoting and protecting the agricultural industry of the State and for the protection of the public health, safety and welfare. In all civil actions the provisions of this code shall be liberally construed for the accomplishment of these purposes and for the accomplishment of the purposes of the several divisions of this code, and in criminal actions the rule of construction set forth in Section 4 of the Penal Code shall be the rule of construction for this code.''

It is significant that section 19.5 was enacted somewhat later than Business and Professions Code section 7031, which expressly provides that a contractor failing to procure a contractor's license cannot enforce a contract; it was also enacted long after specific unenforceability under section 7031 was recognized by the courts. (*Lewis & Queen* v. *N. M. Ball Sons, supra.*) Despite this backdrop, the Legislature, in amending the Agricultural Code, has refrained from declaring a

forfeiture by legislative fiat in addition to the criminal and civil sanctions for failure to obtain a license. Rather, the Legislature has left for judicial determination the question of enforceability of contracts where one or more of the parties has failed to obtain a license as required by the Agricultural Code.

Another of the *Lewis & Queen* criteria that must be weighed by a court in determining whether failure to obtain a license renders a contract unenforceable, is whether ''the forfeiture resulting from unenforceability is disproportionately harsh considering the nature of the illegality.''

Here, we do not have a conventional contract between a farmer and a commercial buyer for the purchase of farm produce; we have a three-way arrangement between plaintiff, defendant and Albers Milling, the pivotal party being Albers. Indeed plaintiff was as much an agricultural producer and farmer as defendant in the overall transaction in that defendant delivered eggs to plaintiff, who caused them to be hatched, and delivered the one-day-old chicks to Albers. It is significant that both plaintiff and defendant were paid, not according to the number of eggs delivered to plaintiff by defendant but by the number of live one-day-old chicks delivered to Albers. Moreover, it was Mr. Fansler, president of plaintiff corporation, who told defendant over a cup of coffee that he had learned that a license was required in the kind of transaction plaintiff and defendant had agreed upon. But the most telling circumstance against a forfeiture is that in the same conversation Mr. Fansler told defendant he had taken steps to obtain the proper license. In fact, plaintiff received a license in less than three weeks after the conversation, while no delivery of eggs was scheduled under the contract for some two months.

Defendant called Mr. Fansler on the telephone approximately a week after the conversation, while plaintiff's application for a license was pending, and notified him that he was cancelling the contract because plaintiff had no license. He ignored Fansler's remonstrance that plaintiff was in the process of obtaining a license. He also overlooked that plaintiff had agreed, at defendant's request, to modify the contract by deferring deliveries of eggs from September (when plaintiff obtained its license) until November. Defendant testified that he was concerned about plaintiff's ability to pay, but the record reflects that if security was what defendant wanted plaintiff was in a position to furnish it through Albers Mill-

ing, the third party in the overall transaction. There is a strong indication that defendant wanted out of the contract because circumstances developed after the contract was executed that made sales of eggs to other outlets more desirable to him. This fact is significant here, not as an attempt to judge the case on its merits, but to demonstrate that defendant, to benefit himself, took advantage of the statute and intentionally imposed a hardship upon plaintiff.

It was never intended that the licensing provisions of the Agricultural Code should be used by one farmer to his profit by working a forfeiture upon another farmer in a three-way transaction of this sort. To hold the contract unenforceable is "disproportionately harsh considering the nature of the illegality," in the light of the facts.

The concluding *Lewis & Queen* criterion for testing the propriety of invoking the drastic remedy of unenforceability is: *"In each such case,* how the aims of policy can best be achieved depends on the kind of illegality and the particular facts involved." (Italics added.)

Protection of the farmer-producer is certainly a matter of public concern, but under the facts of this case it does not appear that the interests of public welfare, health and safety delineated in section 19.5 will be enhanced by holding the contract is unenforceable. Plaintiff's agreement to hatch eggs furnished by defendant, and to deliver one-day-old chicks to Albers, who matured them for the market, did not endanger public health and safety, nor did defendant's obligation to furnish eggs for hatching; in short, there was no danger to public health or safety from the performance of the contract by either plaintiff or defendant, and, *a fortiori,* none resulting from permitting an action on the contract between the parties.

The foregoing discussion is based upon the facts and circumstances peculiar to this case. Sales of agricultural products that directly affect public health, safety and welfare readily come to mind, and in such instances public policy would undoubtedly impel a different result. In concluding that the special defense of illegality is untenable here, I go no further than the facts of this particular case require.

I would reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied November 15, 1967. Peters, J., was of the opinion that the petition should be granted.